**Emily GREENAPPLE, Plaintiff,**

v.

**The DETROIT EDISON COMPANY, Morgan Stanley & Co. Incorporated, and Price Waterhouse & Co., Defendants.**

**No. 75 Civ. 641.**

United States District Court,
S. D. New York.

April 2, 1979.

---

Milberg, Weiss, Bershad & Specthrie, New York City, for plaintiff; Melvyn I. Weiss, David J. Bershad, Jared Specthrie, Samuel Turetsky, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant The Detroit Edison Co.; Marvin Schwartz, Richard J. Urowsky, M. E. Freeman, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant Morgan Stanley & Co., Inc.; Henry L. King, James W. Benkard, Arthur F. Golden, Michael Mills, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant Price Waterhouse & Co.; John R. Hupper, Thomas C. Hauser, Thomas J. Dougherty, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Defendant, The Detroit Edison Company ("Detroit Edison" or "the Company") moves pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint. Plaintiff moves pursuant to Rule 23(c)(1), Fed.R.Civ.P., for class action certification and cross-moves pursuant to Rule 56, Fed. R.Civ.P., for summary judgment in her favor. For the reasons hereinafter stated, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and plaintiff's motion for class action certification is denied as moot.

*The Facts*

Defendant, Detroit Edison is a public utility engaged in the generation, transmission, distribution and sale of electric energy in southeastern Michigan. Detroit Edison's securities are publicly owned and its common stock is traded on the New York Stock Exchange. New issues of securities by Detroit Edison must be registered with the Securities and Exchange Commission ("SEC") pursuant to the Securities Act of 1933 ("Securities Act"). 15 U.S.C. § 77a *et seq.* In addition, as a public utility, defendant is subject to the general jurisdiction of the Federal Power Commission ("FPC")[1] and the Michigan Public Service Commission ("MPSC") both of which regulate the defendant's accounting practices and the manner in which it keeps its books and financial records. Detroit Edison is a "Class A" utility within the meaning of Section 1 of the General Instructions to the accounting regulations of the FPC, 18 C.F.R. Part 101, and is obliged to maintain its books of account and financial records in accordance with the Uniform System of Accounts ("Uniform System of Accounts") promulgated by the FPC. Defendant is permitted to issue and sell its securities to the public after receiving appropriate authorization from the MPSC and where necessary, the FPC.

In September, 1972 Detroit Edison sold four million shares of its common stock to a group of underwriters co-managed by Morgan Stanley & Co., Incorporated ("Morgan Stanley") for resale in a public offering throughout the United States. In connection with this offering a registration statement, including a prospectus dated September 25, 1972 ("prospectus"), was filed with the SEC pursuant to the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.* A copy of the prospectus was sent to each person purchasing any of the four million shares. In response to this public offering, plaintiff, Emily Greenapple, purchased 200 shares of Detroit Edison com-

---

1. The functions of the Federal Power Commission were transferred to the Federal Energy Regulatory Commission pursuant to the De-

partment of Energy Organization Act, 42 U.S.C. § 7101 *et seq.*

mon stock at $19.375 per share for a total cost of $3875.

On February 10, 1975 plaintiff filed the complaint in the present action alleging that Detroit Edison's prospectus deceptively omitted to state certain material facts thereby subjecting Detroit Edison to liability under Sections 11, 12(2) and 17(a) of the Securities Act, 15 U.S.C. §§ 77k, 77*l* (2) and 77q, and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Also named as defendants in the complaint were Price Waterhouse & Co. ("Price Waterhouse"), Detroit Edison's outside auditors, and Morgan Stanley, the lead underwriter.

After interposing answers to plaintiff's complaint and prior to the commencement of discovery, all of the original defendants moved for summary judgment. The Court denied the motion without prejudice to renewal upon plaintiff's completion of discovery. Plaintiff subsequently conducted and completed substantial pre-trial discovery, including depositions of numerous officers and partners of Detroit Edison, Price Waterhouse and Morgan Stanley. Upon completion of discovery, the original defendants renewed their motion for summary judgment and plaintiff cross-moved for summary judgment.

By a stipulation dated April 26, 1978, the action between the plaintiff and original defendants Morgan Stanley and Price Waterhouse was dismissed. Thus, only the issue of defendant Detroit Edison's liability is presently before the Court.

### Discussion

It is a well-settled rule in this Circuit that in considering motions for summary judgment, a district court "cannot try issues of fact, it can only determine whether there are issues to be tried." *S. E. C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978); *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967). However, if the motion for summary judgment reveals that there is no genuine issue as to any material fact and that one party is entitled to judgment as a matter of law, then summary judgment is appropriate even in cases that, at first blush, appear to involve complex factual and legal issues. *See First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); 6 *Moore's Federal Practice* ¶ 56.15[1.–0], at 56–398 (1976). After a thorough review of the briefs, affidavits, depositions, and other materials filed by the parties in connection with the present motions and after considering the facts in the light most favorable to the plaintiff, the Court is of the view that summary judgment in favor of the defendant is indeed appropriate here. Plaintiff has failed to establish any material omissions or misrepresentations in defendant's prospectus which would subject the defendant to liability under the securities laws.

In order to evaluate the parties' contentions properly it is necessary to discuss briefly the nature of the accounting concept of "allowance for funds used during construction" and the nature of defendant's disclosure of this concept. Defendant's prospectus sets forth, in tabular form, its revenues, expenses and income for the years 1967 through 1971 and the twelve month period ended June 30, 1972. The statement indicates for each accounting period the level and sources of utility revenues and the corresponding expenses incurred in utility operations, concluding with a statement of the company's "Operating Income" for each period. Prospectus, PX 1, p. 7.

Under a separate heading designated as "Other Income," the Company reported items of its non-operating income which consisted principally of amounts identified as "allowance for funds used during construction." Both the identification of these sums as AFDC and their inclusion in "Other Income" were explicit requirements of the Uniform System of Accounts in 1972.

Income Account 419.1 of the Uniform System of Accounts, 18 C.F.R. Part 101, Income Accounts, § 419.1, in effect at the time defendant issued its prospectus, provided as follows:

419.1 Allowance for funds used during construction.

This account shall include concurrent credits for allowance for funds used during construction based upon the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used. (See electric plant instruction 3(17).) [2]

Electric Plant Instruction 3(17), 18 C.F.R. Part 101, Electric Plant Instructions § 3(17), further specifies when and how AFDC should be calculated, and required that amounts determined as AFDC should be capitalized and included in plant construction cost. Such amounts then form part of the overall cost of the plant and are subject to depreciation when the plant is placed in service. See Income Account 403, 18 C.F.R. Part 101, Income Accounts § 403. In this manner the costs of funds used in construction are, like all other construction costs, treated as capitalized items to be recognized through depreciation during the useful life of the plant.

The purpose of reporting AFDC in "Other Income" is to adjust the utility's income statement so that it recognizes the capitalization of the cost of construction funds and reports the results of current operations free of them. Such financial costs are deemed by the Uniform System of Accounts to be applicable to the periods when plant is in service because they can then be matched against revenues generated by the facilities. If such a practice were not followed, a utility's income would be substantially and artificially depressed during periods of large-scale construction despite the fact that no change in either operating revenues or operating costs occurred. By capitalizing construction costs and matching them against revenues produced when a plant is in service, a utility reports its earnings in a manner which accurately reflects the true profitability of its operations both during the period of construction and after construction is completed.[3]

The inclusion of AFDC as an item of non-operating income also implements a policy underlying utility rate-making practice. As a general matter, utility rates are designed to reflect the actual costs of producing services for current customers, allowing the utility the opportunity to earn a reasonable rate of return on its rate base property. If costs incurred in plant construction were charged against current revenues, however, and not deferred until the plant was in service, utility income during the construction period would decline sharply. As a consequence, a "revenue deficiency" would be generated and, under normal rate-making practice, a increase in customer rates would ensue. The end result would be to charge current customers for the costs of facilities designed to serve future consumers, rather than the normal practice of requiring each "generation" of customers to pay the full cost of the services which it enjoys.[4]

AFDC reporting is thus essentially a cost allocation device which determines the appropriate period of time for recognizing a normal capital expenditure as an expense of doing business. In this sense it is similar to other common accounting practices, such as the various methods of recording depreciation, which routinely affect the determination of income. However, since utilities are regulated businesses and since the rates they are permitted to charge the public are in part determined by their earnings, AFDC

2. On February 2, 1977 the FPC issued Order No. 561, 42 Fed.Reg. 9161 (Feb. 15, 1977), directing a change in the format of AFDC reporting by public utilities. The order amends the Uniform System of Accounts to provide for the separate presentation in utility income statements of the debt and equity portions of AFDC, and requires that the cost of borrowed funds used for construction purposes be set out as a credit to interest charges. The equity component of AFDC is to be continued as an item of "Other Income" under the account title "Allowance for other funds used during construction." The reclassification does not affect the determination of utility net income.

3. See Affidavit of John W. Johnson, Jr., August 14, 1975, ¶¶ 6–9.

4. See Affidavit of John W. Johnson, Jr., August 14, 1975, ¶¶ 13–15.

reporting also affects the implementation of substantive utility rate-making policy. In this regard AFDC reporting not only allocates costs among various time periods for accounting purposes, but also allocates costs among different customers (or "generations" of customers) in accordance with accepted equitable principles of cost distribution.

At the time defendant issued its prospectus, the concept of AFDC was a well-known and widely-accepted public utility accounting concept, having been in general use throughout the public utility industry for decades.[5]

In the course of its reporting of AFDC in the "Consolidated Statement of Income" section of its prospectus, Detroit Edison made the following footnoted disclosure:

(b) The allowance for funds used during construction, an item of non-operating income, is defined in the Federal Power Commission's Uniform System of Accounts as the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used. The allowance for funds used during construction amounted to 11%, 15%, 13%, 30%, 44% and 46% of net income available for Common Stock for the years 1967, 1968, 1969, 1970 and 1971 and for the twelve months ended June 30, 1972, respectively. The allowance rates for the cost of funds used during construction were 6% for 1967, 6¾% for 1968 and 1969 and 7½% thereafter except for expenditures incurred from July through December 1970 for which a rate of 8½% was used. The amount of the allowance as a percentage of net income available for Common Stock has increased substantially since 1969 principally as a result of substantial increases in construction work in progress and in the costs of capital.

Prospectus, PX 1, pp. 7–8.

Moreover, the text of the prospectus also emphasized under the heading "Dividends and Price Range of Common Stock" that:

allowance for funds used during construction, as a percentage of net income available for Common Stock, increased from 11% during the fiscal year ended December 31, 1967 to 46% for the twelve months ended June 30, 1972; accordingly, a major portion of the Company's current annual dividend of $1.40 per share of Common Stock is being paid from sources other than operating income.

Prospectus, PX 1, p. 4.

Finally, the prospectus provided a concrete example of the relation between plant construction costs and the reporting of AFDC in income. In a descriptive paragraph set forth immediately following the Consolidated Statement of Income, and devoted to an elaboration of factors affecting earnings, the prospectus noted that:

On August 11, 1972, a fault developed in the operation of the Company's newest generating unit, Monroe Plant—unit No. 2, which caused a generator failure with serious resulting damage. The Company and the manufacturer of the unit are making repairs and presently estimate that the unit can be put in service within six months. . . . The Company anticipates that the revenue loss and additional net costs which will be occasioned by this failure will be substantial although the after income tax effect on its operations will be offset by the decrease in depreciation allowance and increase in allowance for funds used during construction resulting from delay in the unit's being placed in service.

Prospectus, PX 1, p. 8.

Defendant's prospectus thus contained an analytic account of AFDC, a quantitative description of its relation to net income and dividends, and a concrete example of how AFDC reporting functions.

Plaintiff contends that the "particular circumstances" of Detroit Edison in 1972 rendered its explanation and disclosure of

---

5. See Affidavit of Kenneth G. Cadematori, August 26, 1975, ¶¶ 7–9; Reply Affidavit of Kenneth G. Cadematori, August 11, 1977, ¶¶ 3, 4;

Affidavit of Richard J. Urowsky, August 21, 1975 and exhibits thereto.

AFDC improper and that these circumstances required more extensive disclosure in order fairly to apprise the readers of the prospectus of the nature and significance of AFDC.[6] Plaintiff also contends that the financial presentation and the narrative disclosure in the prospectus conveyed the impression that AFDC was a current source of funds which could be used to pay dividends and to furnish Detroit Edison's construction program, omitted disclosure that it was non-cash income, and failed to adequately explain the precise nature of AFDC as a capitalized cost item. Apparently abandoning her complaint allegations of violations of Sections 12(2) and 17 of the Securities Act and of Section 10(b) of the Exchange Act, plaintiff now seeks to predicate liability primarily upon Section 11 of the Securities Act.[7] The alleged omissions and misrepresentations, plaintiff asserts, were material as a matter of law.

Defendant contends that there were no "special circumstances" surrounding Detroit Edison's reporting of AFDC which rendered it false and misleading and that all amounts reported as AFDC were assured of recovery through the rate making process. Defendant also contends that its prospectus did not misrepresent AFDC as giving rise to the receipt of cash in the current period nor otherwise misrepresent or fail to disclose material matters relating to AFDC.

An issuer of securities is absolutely liable under Section 11 of the Securities Act[8] in the event a registration statement filed with the SEC, upon becoming effective, contains an untrue statement of a material fact or omits to state a material fact necessary to make statements made not misleading. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Beecher v. Able, 374 F.Supp. 341, 346 (S.D.N.Y.1974); Feit v. Leasco Data Processing Equipment Corp., 332 F.Supp. 544, 575 (E.D.N.Y.1971); Escott v. Bachris Construction Corp., 283 F.Supp. 643, 683 (S.D.N.Y.1968). However, as an examination of the statutory language of Section 11 indicates, not every omission is actionable. An omission is not actionable unless there is a material fact omitted and unless the material fact that is omitted adversely affects the reliability of other statements. A fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Moreover, in evaluating allegations of omission or misrepresentation the Court must be mindful of both Judge Mansfield's statement in Richland v. Crandall, 262 F.Supp. 538, 554 (S.D.N.Y.1967), that "corporations are not required to address their stockholders as if

**6.** Plaintiff's diffuse and inartfully drafted complaint alleges that AFDC was a projection of future earnings on specific construction projects falsely reported as present income in defendant's prospectus, that no disclosure was made of the risk that such "projected" income would never in fact be earned, and that the AFDC rate used by the defendant was deceptive and virtually assured that the "projected" income could not be fully realized. See Complaint ¶¶ 6–8, 11, 12, 14–15 and 17. Plaintiff has, as defendant notes, apparently abandoned these allegations and now concedes that the inclusion of AFDC in income is a proper and required accounting practice for regulated utilities, and does not result, at least generally, in an unfair or misleading presentation of utility earnings. See Plaintiff's Statement Pursuant to General Rule 9(g) ¶ 14.

**7.** See Plaintiff's Memorandum in Support of Cross-Motion for Summary Judgment and In Opposition to Defendant's Motion for Summary Judgment, pp. 11–13.

**8.** Section 11 of the Securities Act, 15 U.S.C. § 77k, provides in relevant part:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement . . . .

Section 6(a) of the Securities Act, 15 U.S.C. § 77f(a), requires the issuer to sign the registration statement.

they were children in kindergarten," and Judge Friendly's admonition in *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973), who, after quoting Judge Mansfield's statement, stated that "it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts."

■ In the instant case, taking the evidence in the light most favorable to the plaintiff, as the Court must on defendant's motion, the Court concludes that plaintiff has completely failed to support her allegations that defendant's prospectus contained material omissions or misrepresentations that would warrant the imposition of Section 11 liability.

Plaintiff's principal contention is that "special circumstances" surrounding Detroit Edison's financial condition in 1972 rendered its reporting of AFDC false and misleading, although such reporting was required by the FPC's Uniform System of Accounts and was otherwise consistent with generally accepted accounting principles as applied to utilities. Plaintiff contends that special circumstances such as the Michigan Public Service Commission's failure to provide adequate rate relief to defendant cast doubt on the Company's ability to recover capitalized costs, including AFDC, in the future through the process of plant depreciation.[9]

This argument appears to be based upon essentially the same premise as plaintiff's now-abandoned complaint theory: that AFDC represents a projection of future earnings and that disclosure must therefore be made of any factor which questions whether such earnings will in fact be realized. However, as the undisputed expert evidence adduced by defendant establishes, AFDC is not in fact a prediction of income and has no relationship to a projection of profit levels in the future.

Indeed, as the Court set forth above, the purpose of AFDC reporting is merely to segregate the financial costs associated with plant construction from the determination of utility income during the construction period in order that income reported fairly reflect the results of current operations. Since plant under construction will not generate revenues until placed in service, it is appropriate for utilities to defer financial costs associated with construction until the future, and report such costs as items of expense (through depreciation) at that time.[10] The only qualification on the accounting practice is that there be reasonable assurance that the deferred costs will be recoverable out of future revenues. In the case of a regulated utility the reasonable assurance is provided by the utility's opportunity to earn a reasonable rate of return on its investment in rate base property. Thus, as the defendant points out, the SEC in Accounting Series Release No. 163 (November 14, 1974), 5 CCH Fed. Sec.L.Rep. ¶ 72,185, explicitly permits regulated utilities to capitalize the costs of funds used during construction in recognition of the fact that the accounting practice is based, in the case of utilities, upon a fundamental difference "in the economic characteristics of the assets involved. . ."

In light of the undisputed evidence adduced by defendant, it is apparent that the factors identified by the plaintiff as affecting the recoverability of AFDC, and allegedly distinguishing Detroit Edison's use of AFDC were irrelevant to the accounting practice. Failure to mention these factors in connection with AFDC would thus hardly make defendant's use of AFDC misleading or subject the defendant to liability under Section 11.

---

9. Among the other factors identified by the plaintiff for disclosure in the prospectus are: (1) the fact that defendant was facing rising costs, (2) the possibility that defendant's bond rating might be reduced from AA because of its declining interest coverage, (3) the fact that federal income taxation would require receipt in gross revenues of approximately twice the amounts reported as AFDC in order for all capitalized construction funds costs to be recovered, and (4) the length of the depreciation period during which recovery would take place. *See* Affidavit of Melvyn I. Weiss, June 6, 1977, ¶¶ 10, 11, 63, 15–17, 74–80, 70–73 and 52–53.

10. *See* Affidavit of John W. Johnson, Jr., August 14, 1975, ¶¶ 7–12.

In any event, as the defendant notes, the fact that Detroit Edison was confronting rising costs in 1972, and that it was not receiving rate relief from the MPSC at the levels it requested, were fully disclosed in the prospectus. Indeed, the prospectus enumerated many of the uncertainties which might have an adverse effect upon future earnings, including rising interest rates and fuel costs, the need for adequate and timely rate relief and the impact of existing and future environmental regulation. *See* prospectus, PX 1, pp. 8, 9, 12 and 14. On page 9, for example, the prospectus summarizes the defendant's intention to seek further rate relief and states: "[f]ailures or significant delays in obtaining approvals of adequate rate increases, both in currently pending and future proceedings, will adversely affect the Company's financial position and results of operations." However, as defendant argues, such factors hardly distinguish Detroit Edison from any other utility with respect to AFDC reporting. The factors were discussed in Detroit Edison's prospectus not because they affect the recoverability of AFDC, but because they are relevant to future income and because they provide added information about the defendant's past earnings performance. In short, plaintiff has failed to adduce any evidence to support her allegation that defendant's use of AFDC was any different from that of any other utility or that any special circumstances existed which made defendant's use of AFDC misleading. The Court must therefore reject plaintiff's contention.

Plaintiff's second major assertion is that Detroit Edison's prospectus misrepresented that AFDC income gives rise to receipt of cash in the current period for which such income is reported. Through the affidavit of her expert accountant, Herbert Porcelan, dated June 6, 1977, plaintiff contends that defendant's prospectus failed to disclose with reasonable adequacy the non-cash nature of AFDC and that by including AFDC in the "Statement of Changes in Financial Position" section of the prospectus, defendant created the impression that AFDC had a present positive impact on Detroit Edison's revenues and working capital.

In view of the express disclosures on the face of the prospectus, the Court finds plaintiff's contention without merit. The footnote disclosure found at pages 7 and 8 of the prospectus and set forth in full above, together with narrative disclosure appearing elsewhere in the prospectus make it clear that AFDC is a non-cash, cost item applicable to construction. The footnote states in three places that AFDC is a cost item, specifies the AFDC rate, and links the increasing percentage of net income available for common stock represented by AFDC to increases in construction work in progress and the costs of capital. In addition, as noted above, the prospectus contains a description of the working of AFDC accounting which explicitly shows that an increase in amounts reported as AFDC, resulting from the failure of defendant's new generating unit, Monroe Plant—unit No. 2, may be accompanied by a decrease in revenues received in the current period.

In the Court's view, the descriptions contained in the prospectus refute plaintiff's allegation that the prospectus did not adequately disclose, to a reasonable potential investor who chose to examine the document with the requisite care which the document required, that AFDC does not give rise to revenues during the current accounting period. Nor does the fact that AFDC was not expressly described as a "non-cash" item change the adequacy of defendant's disclosure; "corporations are not required to address their stockholders as if they were children in kindergarten." *Richland v. Crandall, supra.*[11]

■ Similarly, plaintiff's contention that the prospectus misrepresented that current dividends were being paid out of AFDC is also without merit. As the Court has set forth above, the prospectus, on page 4,

---

11. The Court notes that plaintiff's expert offers no authoritative accounting support for his opinion that defendant should have expressly disclosed the non-cash nature of AFDC. *See* Affidavit of Herbert Porcelan, June 6, 1977, ¶ 18(a).

notes that AFDC had increased considerably since 1967 as a percentage of net income available for common stock, and concludes that "accordingly, a major portion of the Company's current annual dividend . . is being paid from sources other than operating income." In the Court's view, this disclosure does not state or imply that Detroit Edison's dividends were being paid out of AFDC.[12]

In any event, even if the statement on page 4 were supportive of the reading that plaintiff urges, the "Consolidated Statement of Income" at page 7 refers the reader to pages 22 and 23. On page 22, the "Consolidated Statement of Retained Income Used in the Business" section clearly indicates that dividends were being paid from retained income and not AFDC. In addition, on page 23, the "Consolidated Statement of Changes in Financial Position" section clearly indicates that it was necessary for defendant to sell bonds or issue stock in each year in order to generate sufficient cash to meet the costs of construction and the payment of dividends. Similarly, although the "Use of Proceeds" section at page 3 of the prospectus does not expressly disclose that the proceeds of the securities being issued were to be used in part to pay dividends, the Court is of the view, that given the data provided in the prospectus, a reasonable investor would be able to ascertain that fact without having the "sensitive antennae of [an] investment [analyst]." *Gerstle v. Gamble-Skogmo, Inc., supra.*

The Court finds plaintiff's additional allegation that it was materially misleading for the defendant to include AFDC in its estimate of internally generated funds, on page 3 of the prospectus, for the purposes of projecting the approximate amount of outside financing necessary for its 1972 and 1973 construction program equally unconvincing. The purpose of that estimate was obviously to give the prospective investor a rough idea of the amount of external financing that would be required by the defendant. Given the amount of financing involved, $446,000,000 for the year 1972, the amount of AFDC included in that figure, $31,500,000, and the context in which the estimate was made, the Court finds, assuming *arguendo* that such inclusion was improper, that the included amount was immaterial.

None of plaintiff's numerous other allegations merit extended discussion by the Court.[13]

■ In sum, the Court concludes that plaintiff has completely failed to support her diffuse allegations that Detroit Edison violated Section 11 through its use of AFDC reporting. Plaintiff's arguments amount to little more than piecemeal attacks on individual terms and entries in the defendant's prospectus coupled with assertions that they do not explain all that plaintiff might have wanted to know about AFDC. The securities laws, however, do not require that an issuer include an in-depth explana-

---

12. Plaintiff also argues that the defendant deliberately disregarded a request by the SEC staff, conveyed to the defendant's attorney, that the prospectus disclose that a major portion of dividends was being declared upon *noncash* earnings. The undisputed evidence, however, establishes that the SEC staff declared the registration statement effective and therefore apparently regarded the disclosure made in the prospectus, as amended to reflect its suggestions, as satisfactory. *See* Affidavit of Robert B. Hiden, Jr., August 15, 1975, and exhibits thereto; Plaintiff's Rule 9(g) Statement ¶ 6. In the Court's view, this refutes plaintiff's assertion.

13. Plaintiff, for example, asserts that Detroit Edison did not comply with Accounting Release No. 10 ("AR 10"), issued by the chief account-

ant of the FPC, in preparing the "Statement of Changes in Financial Position" contained on page 23 of the prospectus. An examination of AR 10, however, indicates that it is not applicable to defendant's prospectus. AR 10 applies only to disclosures made on the "Source and Application of Funds" schedule contained in "Form 1" filings made by public utilities with the FPC. Plaintiff also makes a conclusory observation that defendant's "Statement of Changes in Financial Position" did not comply with Accounting Principles Board Opinion No. 19 or with generally accepted accounting principles. Plaintiff, however, offers no authoritative accounting support for her vague allegation and a reading of the opinion tends to belie the assertion.

tion of widely-used accounting terms and principles every time it disseminates a financial statement employing such terms and principles to the investing public. As Judge Brieant stated in *Freedman v. Barrow,* 427 F.Supp. 1129, 1140 (S.D.N.Y.1976), in the context of a challenge to the method in which various accounting principles were applied in a proxy statement:

> Perhaps in a different world a detailed description of hundreds of pages setting forth all the accounting ramifications . . . would be desirable for whatever edification the average shareholder could derive. Whatever the relative merits of such a costly work, the law does not require it. Such in-depth treatment would take more than a few pages, and few but accountants, lawyers and financial analysts could comprehend it. It would be necessary to precede the discussion of the accounting treatment with a full explanation to the stockholders of such accounting terms as capital account, earned surplus, gross and net profit, net worth, cash flow and others. The intricacies of income tax law and the accrual method of accounting must be understood, all merely as prerequisites to carrying the shareholder intelligently through . . . the various entries . . . .

The securities laws require merely that matters disclosed should neither be misleading nor omit facts necessary to make disclosed statements not misleading to a reasonable investor. Defendant has met that requirement in the instant case.

Accordingly, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. In view of this disposition, plaintiff's motion for class action certification is denied as moot.

Settle judgment on notice.