Emily GREENAPPLE,
Plaintiff-Appellant,

v.

The DETROIT EDISON COMPANY,
Defendant-Appellee.

No. 207, Docket 79–7352.

United States Court of Appeals,
Second Circuit.

Argued Oct. 12, 1979.

Decided March 17, 1980.

Melvyn I. Weiss, New York City (David J. Bershad, Jared Specthrie, Jerome M. Congress, Craig L. Tessler, Milberg, Weiss, Bershad & Specthrie, New York City, of counsel), for plaintiff-appellant.

Marvin Schwartz, New York City (Richard J. Urowsky, M. E. Freeman, Sullivan & Cromwell, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This appeal poses the issue of whether the accounting treatment of the cost of obtaining construction financing, as portrayed in a registration statement containing a prospectus covering appellee Detroit Edison Company's 1972 stock offering, might have misled reasonably prudent investors as to a material aspect of that public utility's financial condition. More particularly, the Court is called upon to decide if the inclusion of the cost of such funding under the heading of "other income," pursuant to federally mandated regulations, taken together with other references to this funding in the prospectus, might have led the reasonably prudent investor to believe that this capital expenditure was the equivalent of cash revenue. Having been requested by both parties to resolve the matter on the basis of the pleadings and the extensive discovery which had been conducted, the district court in a carefully considered opinion held that the prospectus was not misleading and ordered that summary judgment be entered in favor of the defendant issuer. We affirm.

I.

## THE AFDC CONCEPT

Located in southeastern Michigan, Detroit Edison is a major public utility engaged principally in the generation, transmission, distribution and sale of electricity. As a "Class A" utility within the meaning of applicable federal regulations,[1] it is required to maintain its books and records in the manner prescribed by the Uniform System of Accounts promulgated by the Federal Power Commission under the authority of Section 301 of the Federal Power Act, 16 U.S.C. § 825.

Recognizing that utilities must often expend large amounts of money in order to amass the staggering sums necessary for new plant construction, the Uniform System of Accounts provides explicit, mandatory instructions for the accounting treatment of this cost. Under 18 C.F.R., Part 101, Electric Plant Instructions § 3(17) (1972),[2] the "[a]llowance for funds used during construction" (AFDC) is defined as including both a debt component, that is, ordinary interest paid on borrowed funds, and an equity component, that is, the imputed cost to the utility of the diversion of its own capital to the construction project. This

---

1. 18 C.F.R., Part 101, General Instructions § 1.

2. 18 C.F.R., Part 101, Electric Plant Instructions § 3(17) (1972), provides in relevant part:
   "3. *Components of Construction Cost.* The cost of construction properly includible in the electric plant accounts shall include, where applicable, the direct and overhead costs as listed and defined hereunder:

   \*   \*   \*   \*   \*   \*

   "(17) 'Allowance for funds used during construction' includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used."
   The FPC regulations in effect in 1972 govern the prospectus at bar.

definition is reiterated at 18 C.F.R., Part 101, Income Accounts § 419.1 (1972),[3] which further dictates that this amount, although a capital expenditure, must be carried as an item of "other income."[4] This seeming mischaracterization is compelled by other provisions of the accounting system, which require that *all* debt charges be recorded as current expenses regardless of whether they are incurred pursuant to capital formation or as ordinary interest payments, 18 C.F.R., Part 101, Income Accounts §§ 427, 431 (1972).[5]

Since AFDC is in reality a contribution to capital, unrelated to current operations, its entry as a debit must be offset, and hence, it is entered as an item of "other income." Depicted as an asset, AFDC is, in essence, merely a balancing entry necessary to prevent its debit counterpart from causing an unwarranted diminishment of the utility's current net income figure. Plainly then, this treatment of AFDC does not tend to distort a utility's reported net income but rather acts to preserve its accuracy. Its entire purpose and effect is to defer the cost of capital accumulation to a future time when the physical asset being financed is in operation and the utility is able to commence the recovery of its investment, including AFDC, through rate increases granted to offset the depressing effect on net income of increased depreciation.[6]

Failure to make this adjustment would result in a mismatching of costs and revenues with prejudice to the utility's current customers. Were AFDC treated as an item of ordinary expense, the utility's earnings would be substantially depressed during periods of construction and consumers would pay higher rates. Subsequently, when construction was completed, earnings would be artificially inflated, and rates would be maintained or reduced. The AFDC mechanism, by delaying the recognition of the capital expenditure until the new plant is functional, implements the sound policy of charging utility customers for the services which they are currently receiving, rather than burdening present users for the cost of facilities which will serve future generations.

This allocation of the cost of capital to a future period has not always been achieved in precisely this manner. Prior to 1969, the Uniform System of Accounts directed that the "interest charged to construction" be entered in a non-income account which was used to offset ordinary interest expenses. Aiming for " a more realistic and revealing income statement," the AFPC in 1969 amended its accounting regulations to require that this cost, later redesignated "AFDC" in recognition of the fact that it included an equity as well as a debt component, be entered as an item of non-

---

3. 18 C.F.R., Part 101, Income Accounts § 419.2 (1972) provides in relevant part:
   "419.2. Allowance for funds used during construction.
   "This account shall include concurrent credits for allowance for funds used during construction based upon the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used. (See electric plant instruction 3(17).)"

4. *See* 18 C.F.R., Part 101, Income Accounts § 403 (1972).

5. 18 C.F.R., Part 101, Income Accounts § 427 (1972) provides in relevant part:
   "427 Interest on long term debt.
   "A. This account shall include the amount of interest on outstanding long-term debt issued or assumed by the utility, the liability for which is included in account 221, Bonds, or account 224, Other Long-Term Debt.

"B. This account shall be so kept or supported as to show the interest accruals on each class and series of long term debt." 18 C.F.R., Part 101, Income Accounts § 431 (1972) provides in relevant part:
   "431 Other interest expense.
   "This account shall include all interest charges not provided for elsewhere."

6. The interplay between AFDC, depreciation and utility rates is simply explained. Depreciation diminishes net income. AFDC, defined as a capital cost, increases the basis from which depreciation is calculated. By enlarging the annual amount of claimed depreciation, AFDC therefore further reduces net income. As a consequence, customer charges will be adjusted upwards since the rate-making apparatus is designed to permit regulated industries to recover such costs.

operating income. FPC Order No. 389 (October 9, 1969). In 1977, long after the registration statement and prospectus challenged in this action had been issued, the FPC again revised the treatment of AFDC, this time separating the debt and equity components—returning the former to its pre-1969 position as a credit against ordinary interest charges, and retaining its equity analog as "other income." FPC Order No. 561 (Feb. 2, 1977). Thus, while the implementation of the FDC concept has been fine-tuned on occasion, its use has long been mandated by the FPC. Additionally, it has been specifically approved by the Accounting Principles Board, see Addendum to Accounting Principles Board Opinion No. 2 (December, 1962)[7], and recognized as appropriate for regulated industries by other governmental agencies including the Securities and Exchange Commission. See Accounting Series Release No. 163 (November 14, 1974), 6 CCH Fed.Sec.L.Rep. ¶ 72,185.

## II.
## THE PROCEEDING BELOW

Appellant's unhappy exposure to the AFDC concept occurred in 1972, when pursuant to a public offering she purchased 200 shares of Detroit Edison stock. As required by the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq., the distribution was covered by a registration statement which included a prospectus dated September 25, 1972. The latter document contained, inter alia, a consolidated statement of income setting forth in tabular form appellee's revenues, expenses and income for the years 1967 through 1971 and for the twelve month period ended June 30, 1972.

As required under the Uniform System of Accounts, AFDC was included under the heading "other income," and comprised a substantial portion of that figure. The entry was amplified by Note (b), located at the foot of the income statement, which read:

The allowance for funds used during construction, an item of non-operating income, is defined in the Federal Power Commission's Uniform System of Accounts as the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used. The allowance for funds used during construction amounted to 11%, 15%, 13%, 44% and 46% of net income available for Common Stock for the years 1967, 1968, 1969, 1970 and 1971 and for the twelve months ended June 30, 1972, respectively. The allowance rates for the cost of funds used during construction were 6% for 1967, 6¾% for 1968 and 1969 and 7½% thereafter except for expenditures incurred from July through December 1970 for which a rate of 8½% was used. The amount of the allowance as a percentage of net income available for Common Stock has increased substantially since 1969 principally as a result of substantial increases in construction work in progress and in the costs of capital.

In the course of the proceeding below, appellee introduced into evidence a compar-

7. The Addendum to Opinion No. 2 of the Accounting Principles Board states, in pertinent part:

". . . differences may arise in the application of generally accepted accounting principles as between regulated and nonregulated businesses, because of the effect in regulated businesses of the rate-making process, a phenomenon not present in nonregulated businesses. Such differences usually concern mainly the time at which various items enter into the determination of net income in accordance with the principle of matching costs and revenues. For example, if a cost incurred by a regulated business during a given period is treated for rate-making purposes by the regulatory authority having jurisdiction as applicable to future revenues, it may be deferred in the balance sheet at the end of the current period and written off in the future period or periods in which the related revenue accrues, even though the cost is of a kind which in a nonregulated business would be written off currently."

The SEC deems approval of principle, standard or practice by the Accounting Principles Board of the American Institute of Certified Public Accountants to be substantial evidence that such procedure is in accord with "generally accepted accounting principles." SEC Accounting Series Release No. 150 (December 20, 1973), 5 CCH Fed.Sec.L.Rep. ¶ 72,172.

ative study it had prepared of the treatment given AFDC in 129 public utility prospectuses issued during the relevant period. This uncontradicted study established that Detroit Edison's presentation and explanation was as comprehensive as any, and considerably more so than the great majority. The record further reveals that much of the wording of Note (b) was suggested by an SEC staff member, and that before publication, the completed prospectus was reviewed by other SEC staffers and by two FPC employees.

AFDC figured elsewhere in the prospectus; it was included as an item of income in the Consolidated Statement of Changes in Financial Position set forth at page 23 of the prospectus, and accompanied by a note which referred to the explication of AFDC set forth above. Also, at page 4, in a passage dealing with dividends and the price range of common stock, it was noted:

> [AFDC], as a percentage of net income available for Common Stock, increased from 11% during the fiscal year ended December 31, 1967 to 46% for the twelve months ended June 30, 1972; accordingly, a major portion of the Company's current annual dividend of $1.40 per share of Common Stock is being paid from sources other than operating income.

Lastly, in discussing the economic consequences of a breakdown of one of the issuer's generating facilities, the prospectus at page 8 stated:

> The Company anticipates that the revenue loss and additional net costs which will be occasioned by this failure will be substantial although the after income tax effect on its operations will be offset by the decrease in depreciation allowance and increase in the allowance for funds used during construction resulting from the delay in the unit's being placed in service.

■ After suffering a decline in the market value of her investment, appellant commenced a would-be class action in 1975, charging Detroit Edison and two other parties who have been conditionally dismissed from the suit [8] with contravention of various provisions of the federal securities acts, most notably Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, which imposes a form of strict liability for material misstatements or omissions of fact in registration statements.[9] The complaint charged that the AFDC mechanism was inherently misleading, was not in accordance with proper accounting principles, and left potential investors unable fairly to appraise the issuer's true financial condition. In essence, it was averred that the prospectus created the impression that AFDC was tantamount to cash, whereas in reality it was "phantom income," constituting only a "projection of future earnings" the realization of which was dependent upon such uncertainties as the grant of favorable rate adjustments and numerous other vagaries deemed by appellant to be either insufficiently disclosed in the prospectus or omitted altogether. Appellant hypothesized that Detroit Edison was motivated to em-

---

**8.** These parties are the underwriter, Morgan Stanley & Co., Inc., and the independent auditor, Price Waterhouse & Co.

**9.** 15 U.S.C. § 77k (Section 11) provides in relevant part:

Civil liabilities on account of false registration statement

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—[all responsible persons].

Strict liability under Section 11 is subject to two provisos: first, the misstatements or omissions must be material, and second, while plaintiff need show no causal connection between the decline in the price of the security and the materially false misstatement or omission, the defendant may escape liability in whole or in part if he can prove that the decline in market value is unrelated to the material misstatements or omissions, 15 U.S.C. § 77k(e). *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 49 n.22 (2d Cir. 1978), cert. denied 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1979). *See also Feit v. Leasco Data Processing Equipment Corp.,* 332 F.Supp. 544, 585–86 (E.D.N.Y.1971).

ploy this allegedly deceptive accounting convention in order to conceal the dramatic deterioration of its "real" earnings, which deterioration, had it become known, would have made access to the capital markets far more difficult, thereby imperiling the completion of construction projects then underway. The arithmetical accuracy of the figures set forth in the registration statement was not challenged.

During the course of discovery, appellant came to the realization that whatever the intrinsic defects of AFDC, it was a mandatory accounting procedure for Class A utilities, and that the Uniform System of Accounts, while not precluding supplemental or explanatory material, gave Detroit Edison no discretion to depart from it in its prospectus. Appellant therefore jettisoned all causes of action involving scienter, as the establishment of that element was seemingly barred by the requirement that Detroit Edison adhere to the accounting rules of the FPC. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1283 (2d Cir. 1973); *Escott v. BarChris Construction Corp.*, 283 F.Supp. 643, 683 (S.D.N.Y.1968). Proceeding solely under Section 11, appellant altered her line of attack, disengaging from the frontal assault on the legitimacy of the AFDC mechanism itself in favor of a more indirect, flanking movement. Appellant averred that Note (b) and the other references to AFDC in the registration statement permitted potential investors to be misled into believing that AFDC, reported as an item of "other income," was equivalent to cash. Additionally, appellant claimed that the peculiar circumstances of Detroit Edison's finances—to wit, its increasingly higher proportions of AFDC relative to dwindling net incomes—placed the utility under a unique obligation to explain fully and completely the true nature of this accounting device and the numerous contingencies which might bear upon the subsequent recoupment of this expense.

The parties agreed that summary adjudication was appropriate and submitted the case upon stipulations of fact, the extensive record of discovery and their respective memoranda. Since there existed no dispute as to any material fact, the district court resolved the case upon the litigants' cross-motions. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978). In a thorough opinion, Judge Ward bluntly rejected appellant's "diffuse" and "piecemeal" attack upon the prospectus, holding that explanatory Note (b) was fair and accurate in its depiction of AFDC and that the "special circumstances" urged by appellant as warranting fuller exposition were either irrelevant to AFDC reporting or adequately disclosed. In short, the court below found that the misleading statements alleged in the complaint were immaterial within the meaning of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). *See Greenapple v. Detroit Edison Co.*, 468 F.Supp. 702, 711–12 (S.D.N.Y.1979).

### III.

### CLAIMS ON APPEAL

Before this Court, appellant in large measure reiterates the contentions urged unsuccessfully below. Appellant's assault on the adequacy of the prospectus comes in three waves. First, the computation of the equity component is claimed to be so esoteric and arbitrary as to render the AFDC calculation somewhat suspect, and to require a more extended disclosure than that which is given. Next, appellant contends that what was said regarding this accounting procedure was misleading and deceptive. Finally, appellant posits a unique obligation on the part of Detroit Edison to accurately describe AFDC owing to the issuer's distressed financial situation, and the comparative importance to it of reporting AFDC as an element of current income. Considered singly or cumulatively, these arguments are without merit.

### A. *Scope and Standard of Review.*

■ Commendably, the parties have whittled the controversy down to the question of whether Detroit Edison fulfilled its

duty to disclose the true nature of AFDC "income." Thus, as was previously stated, there is no dispute as to the mathematical accuracy of the sum as computed, nor is there a claim that AFDC, in and of itself, is not material to the utility's general financial condition. Since the factual nature of the disclosure is not at issue, it may seem at first blush that no cause of action is stated under Section 11, since that provision proscribes only misstatements or omissions of material facts. Appellee recognizes, however, that notwithstanding the broad discretion which issuers have in assembling and organizing their data, where the method of presentation obscures or distorts the significance of material facts, a violation of Section 11 will be found. *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 565 (E.D.N.Y.1971); *Richland v. Crandall*, 262 F.Supp. 538, 553–54 (S.D.N.Y.1967) (Mansfield, J.); *Blackett v. Clinton E. Frank, Inc.*, 379 F.Supp. 941, 946 n.14 (N.D. Ill.1974).

Further, this appeal does not require that we resolve the potentially troublesome question of whether adherence in a registration statement or prospectus to a federally mandated accounting practice absolves the issuer from liability under Section 11 even in the event that such procedure is deemed to be inherently misleading or contrary to generally accepted accounting principles. Appellant argues merely that unless fully explained, the designation of AFDC as "other income" is deceptive and that therefore clarification is necessary. What is at issue is not the use of AFDC *per se*, but whether the gloss placed upon it in the prospectus rendered that document misleading. Under the facts of this case, the focus is on the propriety of the explanatory and collateral references, not upon the innate legitimacy of the device.

■ While the scope of our inquiry is thus confined, our standard of review is broad. Since the only issue presented concerns the application of a legal standard to undisputed facts, we have a vantage point as commanding as the court below, and are therefore free to reject its conclusions.

*Kennecott Copper Corp. v. Curtis-Wright Corp.*, 584 F.2d 1195, 1200 n.3 (2d Cir. 1978); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 15 (2d Cir. 1977). The exercise of our judgment in this matter is not bound by any hard and fast rules or regulations, or even by a substantial body of case law. For whatever reason, precedents under Section 11 are meager, *see* Jennings and Marsh, Securities Regulation at 825 (4th ed. 1977), and almost non-existent when dealing with a claim of misleading presentation as opposed to the more familiar controversy over whether a given fact is material to the issuer's finances. Notwithstanding our appellate latitude we decline to disturb the judgment of the court below.

B. *Presentation of AFDC in the Prospectus.*

1. *Computation of the AFDC Figure.*

Although Detroit Edison had no discretion regarding the computation of AFDC, appellant challenges that figure as a predicate for her claim that a better definitional section was necessary. The attack is based upon the notion that the inclusion of the equity component was contrary to sound accounting principles; specifically, it is claimed that the use of internally generated funds is not a capital expenditure in the same sense as the payment of ordinary interest, that the correct figure is incapable of ascertainment since it represents only a "theoretical" loss on the income which might have been derived therefrom had such funds not been diverted for new plant construction, and that such value as is ascribed to the application of internal funds to construction should be discounted in view of the fact that its recovery will not commence for a lengthy period of time.

While the capitalization of the equity component of construction financing costs may not be countenanced in ordinary businesses, the unique economics of regulated industries justifies specialized accounting conventions. Unlike ordinary commercial enterprises, utilities are subject to a rate-making process that virtually guarantees the recovery of capital costs, including the

imputed cost of diverting internal funds to a construction project. Moreover, utilities are capital-intense ventures, whose allure to investors is not the possibility of dramatic growth or sharply enhanced earnings, but the ability to pay dividends. The diversion of equity funds diminishes a utility's ability to provide an attractive rate of return to a degree not known to other commercial enterprises and thus potentially hampers its access to capital. The AFDC mechanism takes these factors into account; it has been in use for many years and its propriety was confirmed as recently as 1977 when the FPC issued Order No. 561 (Feb. 2, 1977), amending the Uniform System of Accounts to require that the equity component of AFDC continue to be included under its present "other income" heading, although the debt component was returned to the separate account used prior to 1969.

Furthermore, although appellant characterizes the value placed upon the equity component as "theoretical," implying that this figure is exaggerated, such is not the case. As is explained in the definitional note, the amount ascribed to the equity component is based upon the actual rates applying to the debt component. Thus, the figure reached is neither fanciful nor overblown.

Finally, the notion that the AFDC figure, as to both its debt and equity elements, should be discounted to reflect the current value of money which will be recouped only in future periods, is nonsensical since it would result in precisely the distortion which the AFDC accounting device is meant to alleviate. Such a practice would decrease the utility's immediate income, thereby resulting in higher rate charges, and subsequently, through a diminishment in the basis of depreciation, tend to increase income in future years, thereby lowering rates in that period. The net effect would be to burden present customers with the cost of future facilities. No commercial enterprise discounts current capital costs, and indeed, appellant's own expert accounting witness did not suggest that such a practice was warranted.

### 2. AFDC as Portrayed in the Prospectus.

Appellant's principal claim on appeal is that Detroit Edison violated Section 11 because it failed to expressly disclose the non-cash nature of AFDC, and in fact, created the impression that it was synonymous with "true" (i. e., cash) income. This erroneous impression was allegedly imparted through semantic artifice, compounded on one occasion by disregard of applicable accounting principles. We find these claims to be without merit.

#### a. Note (b).

Appellant first points to the note defining AFDC, and particularly to the sentence reading, "the allowance for funds used during construction amounted to 11%, 15%, 13%, 30%, 44% and 46% of net income available for Common Stock for the years 1967, 1968, 1969, 1970 and 1971 and for the 12 months ended June 30, 1972, respectively." Although the preceding sentence stated that AFDC was non-operating income, and that it was in fact a cost item, it is contended that this passage implies that AFDC funds constituted cash revenues available for distribution to shareholders. Plainly, however, such an interpretation is unreasonable when the highlighted sentence is read in context. Fairly construed, the note simply demonstrates that as measured relative to AFDC net income steadily declined as construction projects and the costs of capital escalated. Rather than enticing potential investors, this disclosure, properly interpreted, was more likely to have a discouraging effect.

#### b. Dividends.

Appellant also calls attention to the following statement in the portion of the prospectus dealing with dividends: ". . . AFDC allowance for funds used during construction, as a percentage of net income available for common stock, increased from 11% during the fiscal year ended December 31, 1967 to 46% for the twelve months ended June 30, 1972; accordingly, a major portion of the Company's current annual divi-

dend of $1.40 per share of Common Stock is being paid from sources other than operating income." This passage is alleged to suggest that AFDC "income" was a major source of dividend funds, thereby reinforcing the view that it was a cash-like asset.

While the quoted passage is not entirely free from ambiguity and could usefully have been expanded to indicate that the "other sources" included earnings from investments, public offerings and the like but not AFDC, it would not mislead the reasonable investor. Fairly understood, the thrust of the passage was to alert readers that as operating revenues were increasingly being diverted to construction, dividends were increasingly being paid from other sources. The statement at issue does not compel the conclusion that AFDC was being drawn upon to pay dividends; on the contrary, AFDC was merely being used as a measuring rod to indicate the relative decline of operating income as an element of dividend payments. Furthermore, Detroit Edison explicitly indicated that current income was insufficient to cover both dividends and construction costs, and that the shortfall was therefore derived from non-operating revenues such as the proceeds of stock and bond issues. The investor was warned by footnote (a) to the Statement of Changes in Financial Condition that "Net Income" included AFDC. Armed with this information and the Consolidated Statement of Income he could determine that dividends were greater than net income less its AFDC component and that they therefore were being paid from other non-operating sources, not including AFDC.

c. *Internally Generated Funds.*

Appellant cites as improper the inclusion of the AFDC sum in the $446 million of internally generated funds which Detroit Edison asserted would constitute 25% of the total funding of the utility's construction program for the next two years. Set forth on page three of the prospectus, this estimate was intended to underscore the fact that substantial external financing was necessary.

Since AFDC "income" is merely a balancing entry, an offset to expenses not chargeable to the present period, it does seem that the inclusion of it in an amount representing currently available cash funds was erroneous. However, such a misstep does not render the entire prospectus misleading. First, the entry did not on its face indicate that AFDC was included in the sum of money which was expected to come from the utility's own coffers, and therefore did not compound any possible misperception on the part of potential investors that AFDC was a cash item.

Second, appellant has not advanced any persuasive evidence to indicate that this error was material. Although a revised computation would indicate that Detroit Edison would require approximately 82% rather than 75% of its construction funds from external sources, and although in absolute terms this represented a substantial amount of money, there is nothing in the record to indicate that this additional increment would make it more difficult for Detroit Edison to obtain the necessary financing. The testimony of the utility's investment bankers, the only direct evidence on point, was to the contrary.

Moreover, the thrust of the passage was that the utility was in the midst of a massive construction program and that an extremely large proportion of the funds required for this expansion was coming from external sources. That statement is not made materially misleading because in fact a slightly higher percentage of funds than indicated would have to be raised in the capital markets.

d. *Consolidated Statement of Changes in Financial Position.*

Finally, appellant charges that the inclusion of AFDC in the "net income" figure in the Consolidated Statement of Changes in Financial Position buttressed the misimpression that AFDC was interchangeable with cash and constituted a violation of applicable accounting principles. Again, these objections do not withstand analysis.

The net income entry bears a footnote which states that AFDC is included in the computation, and further refers the reader to the definition of the accounting device previously set forth in the income statement. The reader was apprised that the "net income" figure contained certain cost elements within it by the fact that the same footnote was appended to an expense entry denominated as "Plant and Equipment Expenditures."

Appellant contends that the AFDC portion of the "net income" figure should have been broken out and deducted from this total. Such an approach, however, would have required, in order that AFDC be effectively capitalized, that an identical entry be made on the debit side of the balance sheet and subtracted from current expenditures. This offsetting entry would have been improper since AFDC, comprised in part of an equity component, could not be deemed an ordinary expense, and could not legitimately have been characterized as a sum spent on plant and equipment. To avoid that distortion, prevailing accounting wisdom directed that AFDC be treated precisely in the manner it was in the Consolidated Statement of Changes in Financial Position, as undifferentiated items of both income and expense, each balancing the other.

Moreover, it is undisputed that the inclusion of AFDC as an element of income did not distort the bottom line of the statement; the ultimate net profit figure was not affected, and indeed the Consolidated Statement of Changes in Financial Position showed a decrease in working capital. It may be argued, of course, that notwithstanding this bottom line accuracy, the por-

trayal of AFDC as a component of net income was misleading because it artificially inflated the apparent cash flow into the company, a signal consideration in the eyes of some potential investors. It postulates the existence of investors who are at once savvy enough to appreciate concepts such as cash flow and yet unable to comprehend the definition of AFDC fairly and accurately set forth earlier in the prospectus. In determining the adequacy of disclosure, we are required to view the prospectus from the standpoint of the reasonable, not schizophrenic, investor.

Little need be said of appellant's contention that in adding the AFDC total to the Company's "net income," Detroit Edison violated Opinion No. 19 of the Accounting Principles Board. That directive required the deduction of expense items applicable to current operations from overall revenues in determining the amount of cash or working capital generated internally by an enterprise during a reporting period. Since AFDC is not a current expense, but an expense which will be attributed to a later period, it does not seem that Opinion No. 19 condemned the inclusion of AFDC under the net income heading. Moreover, whatever its currency among accounting scholars, Opinion No. 19 had not been expressly incorporated into the Uniform System of Accounts. To the extent that the recommendations set forth therein were embraced by the FPC through its issuance of Accounting Release No. 10, it must be noted that that decree by its own terms was applicable only to annual reports to be submitted to the FPC on its own "Form 1" and not to registration statements or prospectuses.[10] Neither the SEC nor the FPC, each of

---

10. The dissent chides us for "selective application" of the Uniform System of Accounts and the interpretations of those procedures promulgated from time to time by the FPC in accounting releases. Dissenting Opinion, *infra*, at 213 n.2. More particularly, the minority opinion asserts that considerable weight has been given to Detroit Edison's adherence to such rules, but that the failure to follow such principles, specifically those enunciated in Accounting Release No. 10 ("AR 10"), which is based on Opinion No. 19, has been overlooked or not accorded converse significance.

As is noted above, AR 10 by its own terms is inapplicable to prospectuses and in any event, its implementation would not have required an accounting presentation different from that which was set forth by the issuer. Moreover, insofar as the dissent implies that AR 10 is actually part of the Uniform System of Accounts and therefore establishes a mandatory rule for Class A utilities, it is factually in error.

which reviewed the prospectus, objected to AFDC's inclusion amongst "net income" in the Consolidated Statement of Financial Changes.

### 3. *Detroit Edison's "Special Circumstances".*

Finally, appellant maintains that Detroit Edison's economically pinched situation and its reliance upon AFDC to project an attractive balance sheet imposed upon it a commensurately greater obligation to explicate fully the AFDC device than might otherwise be imposed, and to detail all the contingencies upon which its ultimate recovery allegedly hinged. It is asserted that but for the use of AFDC, in the year prior to appellant's purchase, Detroit Edison would have had to report an operating loss. Such a reported loss, it is alleged, would have pointed up the general deterioration of the utility's "real" (i. e., cash) earnings, a trend which might make procurement of construction financing impossible, thus raising a risk that capital projects might not be completed and AFDC not recovered. Additionally, it is argued that even if Detroit Edison continued to receive financial infusions, the economic stability of the company was threatened by events such as the removal from service of the Monroe # 2 generating facility and the utility's inability to obtain rate relief from the Michigan Public Service Commission, and that these developments were not properly reported in the prospectus. These contentions are factually and theoretically wide of the mark.

A dispassionate review of the record casts doubt on the accuracy of appellant's characterization of the utility's financial condition. In its long history, Detroit Edison has never failed to recover its costs from its revenues, nor has it ever foregone a dividend payment, even in times far more perilous than 1972. In fact, the dividend actually increased in the year following appellant's stock purchase. The attempt to demonstrate that the utility did not recoup its expenses from operating revenue in 1971 is based in substantial part on the deduction of dividend payments from operating reve-

nues, a novel accounting procedure which may charitably be described as disingenuous. Moreover, many of the adverse developments adverted to by appellant, such as the removal from service of the Monroe # 2 generator and the persisting friction with the Michigan Public Service Commission were in fact revealed in the prospectus. Thus, there seems no factual predicate for the claim that only an artificial accounting convention stood between Detroit Edison and ruination, or that key developments bearing upon the validity of utilizing that convention were not disclosed.

More to the point, this challenge to the adequacy of the prospectus' disclosure is based on the discredited notion that AFDC is comparable to a projection of future income, and accordingly, must be accompanied by revelation of all factors which may bear upon prospective business conditions. This is fundamentally incorrect; AFDC is not a projection of future income, but a deferral mechanism whereby expenses are charged to a more appropriate future period. The only contingencies upon which its recovery is based are the well-founded assumptions that Detroit Edison will continue in business and that rate making bodies will continue to permit utilities to recover their capital investments. This belief was fully justified in appellee's case despite the fact that the Michigan Public Service Commission had not always permitted as quick a recapture as was desired by Detroit Edison.

■ Thus, appellant's ascription of a sinister motive to Detroit Edison to misrepresent the nature of AFDC is entirely unconvincing. The drafting of the prospectus does not support the claim that the issuer intended to cozen the neophyte, the small investor or anyone else; on the contrary, as has been previously remarked, the definition of AFDC set forth in this prospectus was unsurpassed in its length and comprehensiveness, and its language was suggested and approved by staff members of the SEC and FPC. While the absence of motive and intent does not relieve an issuer of liability under Section 11, it may tend to decrease the likelihood that the presenta-

tion of AFDC in the prospectus will in fact be misleading. In any event, appellant has not established a convincing predicate for its contention that Detroit Edison had an enhanced duty of disclosure with respect to AFDC.

## IV. CONCLUSION

■ In judging the prospectus challenged in this case we are guided by general principles governing the mode of the portrayal of material information in a prospectus. Of course, the SEC's own detailed forms govern the manner of presentation of much material information. Thus, accounting computations relating to an issuer's balance sheet must be set forth in a consolidated income statement and in such other tables as are prescribed. In evaluating the appropriateness of portraying other significant matters whose mode and extent of disclosure are not dictated by these mandatory forms, however, consideration must be given to the function of the document in issue, the persons to whom it will be distributed and the underlying policies of the Securities Act of 1933.

■ The objective of a prospectus is to solicit investment by the general public. Mandatory registration of such materials with the SEC is intended to ensure that the factors entering into prudent investment decisions are depicted in a standardized, comprehensible, and accurate manner. Thus, the intended audience will be extremely broad, encompassing both sophisticated financial analysts and untutored lay persons. As the principal goal of the Securities Act is disclosure, *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), close questions will generally be resolved in favor of the inclusion of information.

■ Given these factors, disclosure in a prospectus must steer a middle course, neither submerging a material fact in a flood of collateral data, nor slighting its importance through seemingly cavalier treatment. The import of the information conveyed must be neither oversubtle nor overplayed, its meaning accurate, yet accessible. *Compare, Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1297 (2d Cir. 1973) ("it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts") *with Richland v. Crandall, supra,* 262 F.Supp. at 554 ("corporations are not required to address their stockholders as if they were children in kindergarten"), *see also Freedman v. Barrow,* 427 F.Supp. 1129, 1140–41 (S.D.N.Y. 1976) (proxy solicitation). The disclosure must be capable of being perceived as material and its significance—that is, its relationship to other aspects of the company's condition—susceptible to common understanding.

■ In our view the AFDC concept was properly set forth in the challenged prospectus, and was neither so obscure nor confusing as to constitute a misstatement of material fact within the meaning of Section 11. The initial explanatory note concisely yet accurately defines AFDC, stating explicitly that it is an item of cost. It goes on to highlight the dramatic increases in AFDC over the past five years, indicating the interest rates upon which these figures were calculated, and attributing this steady rise to an expanded construction program. The increased prominence of AFDC is again called to the reader's attention in the passage found in the text dealing with the consequences of the breakdown of one of the utility's generators. In this fashion the cost allocation function of AFDC and its non-cash, cost nature is well illustrated.[11]

Thus, the criteria for proper presentation of a material fact are fully satisfied; AFDC is portrayed as being of considerable importance to Detroit Edison, and its significance and relationship to the utility's financial condition as a whole can be appreciated by

---

11. As the district court succinctly stated, "Defendant's prospectus thus contained an analytic account of AFDC, a quantitative description of its relation to net income and dividends, and a concrete example of how AFDC reporting functions." *Greenapple v. Detroit Edison Co.,* 468 F.Supp. 702, 707 (S.D.N.Y.1979).

the diligent investor. Comprehended as it should be at the outset, the reasonable reader is not likely to be misled by later references to it in the prospectus.

We do not intimate that appellant's critique of the AFDC presentation is entirely unfounded. To be sure, the quality of the disclosure could have been improved. But the advisability of revision does not render what was done deceptive or misleading. The question is whether the prospectus, as written, adequately apprises the reader of the essential nature of a material facet of the issuer's financial condition. The fair and intelligible definition of AFDC set forth in Note (b) satisfies this basic requirement; the additional analysis proposed by appellant is not an essential increment to the investor's understanding without which comprehension is not possible. Indeed, the initial explanation establishes a point of diminishing returns. To demand more would open the door to unceasing and unreasonable clamorings for all manner of tutoring in basic corporate accounting, which would afford a bonanza to lawyers and regulators with no corresponding benefit to the actual investor.

In its preparation of the prospectus, Detroit Edison adhered to a government mandated accounting system, whose principles have long been recognized as appropriate to regulated industries. It made a fair disclosure of unsurpassed depth. It received the assistance of both the SEC and FPC, and its discussion of AFDC was approved by those agencies. Under all the circumstances, we find that the prospectus was not materially misleading and accordingly, affirm the judgment of the district court.

Affirmed.

IRVING R. KAUFMAN, Chief Judge (dissenting):

I respectfully dissent. In my view, Detroit Edison's failure to disclose clearly the non-cash nature of the "allowance for funds used during construction" (AFDC) reported as "other income" on its income statement materially misstated the company's ability to generate funds from current operations, and therefore violated section 11 of the Securities Act of 1933, 15 U.S.C. § 77k.

The procession of esoteric and sophisticated accounting principles here at issue requires an exposition of the facts which the majority chooses to ignore. Before exploring the defects in Detroit Edison's prospectus, however, the significance of an accurate portrayal of the company's ability to generate cash from its current operations must be made clear. As the majority notes, the allure of an investment in the common stock of a public utility lies not in the remote possibility of sudden growth or appreciation in the stock's market value. Rather, investors are attracted to utility stocks by the prospect of a steady, hopefully high level of dividends. Since dividends constitute the principal return on investment for a utility's common shareholders, an informed appraisal of the company's ability to pay dividends is not only material, but essential to an intelligent investment decision. Such an appraisal, however, requires detailed information on the company's ability to generate cash, both from internal and external sources.

In assessing a firm's ability to generate cash, an investor must go beyond a simple examination of the company's income statement. Since most firms employ the accrual basis of accounting in determining net income, revenues and expenses recognized on the income statement do not necessarily represent cash received or disbursed during the period. Just as a firm may recognize revenues or expenses in connection with transactions that do not produce cash, it may receive or disburse cash in transactions not reflected on its income statement. Thus, issuance of capital stock or bonds will produce cash, and the payment of dividends or construction costs will expend cash, but none of these transactions will ordinarily affect a company's reported net income. Where, as here,[1] a company has undertaken

1. In 1972, Detroit Edison had embarked on a five year program to expand and renovate its existing plant. The company estimated its total construction costs during the period would

a massive construction program, it may report a relatively high net income, and still require extensive outside financing to meet its increasing cash needs. When such companies turn to the securities markets to raise the cash needed to finance their capital expansion, it is incumbent upon them to supply potential investors with accurate information on the sources and amounts of cash already available to the company. Otherwise, it is impossible to appraise accurately the risk associated with the investment being solicited. For example, the risk associated with offers to invest in two utilities, both paying the same level of dividends per share, will differ markedly if one company is able to generate internally 70% of the cash required to pay its dividends and construction costs, while the other can generate only 30% from internal sources.

In the instant case, Detroit Edison's prospectus contained an income statement that reported net income for the fiscal year ending June 30, 1972 of $85.6 million. Of this sum, $31.5 million was attributable to AFDC, reported on the income statement as "other income." The amount reported as AFDC consisted of (1) the interest expense paid by Detroit Edison on its long-term borrowings for capital expansion, and (2) an imputed rate of return on the company's own capital used for construction projects. Although AFDC was composed of expense items that normally would be charged against a firm's income, the Federal Power Commission's Uniform System of Accounts required public utilities to segregate their current expenses (e. g., advertising) from capital expenses (e. g., the cost of borrowed funds used to expand capital plant), and to capitalize the latter expenses for future depreciation. 18 C.F.R., Part 101, Electric Plant Instructions § 3(17) (1972). In this manner, Detroit Edison was able to assign its cost of capital expansion to the period in which the newly created assets would be consumed. Its future customers would thus pay their fair share of services rendered to them through rate adjustments designed to

compensate the utility for its increased depreciation expense as the assets were consumed.

To account for AFDC, Detroit Edison established a depreciable fund on its balance sheet by debiting an asset account, and crediting an income account. In keeping with the requirements of the Uniform System of Accounts, the credit to income was made to an account labelled "other income," and reported as such in the company's income statement on page 7 of the prospectus. 18 C.F.R., Part 101, Income Accounts § 419.1 (1972). Although this credit to "other income" acted to increase Detroit Edison's reported net income, it did not reflect cash or working capital generated by the company during the reporting period. Ordinarily, this fact would have been disclosed in Detroit Edison's statement of changes in financial position ("funds statement"), presented on page 23 of the prospectus, which serves to report the flow of funds in and out of a company, that is, the actual receipt and disbursement of cash and cash-equivalents. In accordance with Opinion 19 of the Accounting Principles Board (APB), all profit-oriented businesses are required to present a funds statement whenever a balance sheet and income statement are issued. "The Statement . . . should begin with income or loss before extraordinary items, if any, and add back (or deduct) items recognized in determining that income or loss which did not use (or provide) working capital or cash during the period. Items added or deducted in accordance with this procedure are not sources or uses of working capital or cash, and the related captions should make this clear . . . ." APB Opinion 19, ¶ 10 (Mar. 1971).

Since AFDC was recognized in computing Detroit Edison's income, but did not produce cash during the period, APB Opinion 19 mandated its subtraction from net income on the company's statement of

---

exceed $2.4 billion, of which it hoped to generate approximately $800 million from internal

sources. Accordingly, it planned to raise $1.7 billion from external financing.

changes in financial position.[2] Even before Opinion 19 was released by the APB, Arthur Litke, Chief Accountant of the Federal Power Commission, anticipated the need to disclose accurately the non-cash nature of AFDC income by issuing Accounting Release (AR) No. 10. In reporting AFDC on the funds statement, AR 10 expressly required separate delineation of AFDC from net income as a "non-cash credit to income," and a corresponding offset to construction and plant expenditures as an application of funds that did not consume cash.[3]

Detroit Edison nonetheless failed to break out the AFDC component of either its net income or construction expenditures in the funds statement presented in its prospectus. Instead, the section of the statement devoted to operating sources of cash simply reports net income of $85.6 million, to which $61.5 million in depreciation, $13.4 million in deferred income taxes, and $8.9 million in investment tax credits are all added back as expenses that did not use cash. Since the statement reports no additions to income that did not produce cash, such as AFDC, the "total resources from operations" is depicted as the sum of the above figures, $169.4 million. If, as APB Opinion 19 and AR 10 required, AFDC had been subtracted from net income on the

2. The majority asserts that APB Opinion 19 was inapplicable to Detroit Edison's prospectus because the Opinion's "recommendations" were not "expressly incorporated into the Uniform System of Accounts" and, in any event, because Opinion 19 "required the deduction [only] of expense items applicable to current operations," not future expenses such as AFDC. My brothers' arguments notwithstanding, the fact that Detroit Edison was subject to the jurisdiction of the Federal Power Commission by no means exempts it from the requirements of federal securities laws. *See* 15 U.S.C. § 77c. Accordingly, the disclosures in its prospectus should have been made in conformity with generally accepted accounting principles as authoritatively prescribed by the Accounting Principles Board and its successor, the Financial Accounting Standards Board. SEC Accounting Series Release No. 150 (Dec. 20, 1973). This, however, Detroit Edison failed to do.

Opinion 19 sets forth two alternative procedures for reporting changes in financial position on the funds statement. One method permits a firm "to begin with total revenue that provided working capital or cash during the period and deduct operating costs and expenses that required the outlay of working capital or cash during the period." Opinion 19, ¶ 10. The preferred method, however, is to begin with net income before extraordinary items, then add back or deduct "items recognized in determining that income or loss which did not use (or provide) working capital or cash during the period." *Id.* Had Detroit Edison begun its funds statement with "total revenue that provided working capital or cash during the period," the majority would be correct in asserting that it was not obligated to deduct future expenses, such as AFDC, from the revenue figure. But Detroit Edison elected to begin its funds statement in the prospectus with net income for the period. Accordingly, it should have deducted items recognized in computing that income, such as AFDC, which did not provide working capital or cash during the period.

3. Though accounting releases promulgated by the FPC's Chief Accountant are not technically a part of the Uniform System of Accounts, the Commission delegated "final authority" to the Chief Accountant to develop and interpret the System of Accounts. 18 C.F.R. §§ 3.4(e)(3) and 3.5(b)(1) (1972). Accordingly, there is simply no justification for the majority's selective application of the express regulations of the Uniform System of Accounts, and their authoritative interpretation in releases issued by the Chief Accountant. When faced with the propriety of Detroit Edison's use of AFDC income accounting, my brothers assert that the format and substance of the company's income statement in its public disclosures to investors were mandated by the Uniform System of Accounts. But when the issue is whether Detroit Edison complied with AR 10 in preparing its funds statement, the majority tells us that the directive was applicable only to annual reports submitted to the Federal Power Commission, "and not to registration statements or prospectuses." This assertion aside, both Arthur Litke, the FPC's Chief Accountant, and John Johnson, Detroit Edison's Chief Accountant, stated that the company's reports to shareholders should conform with the requirements of AR 10. In a letter dated March 12, 1971, Litke advised the company that "[t]he accounting treatment required by AR–10 should not result in any confusion between the F.P.C. Form No. 1 and your Annual Report to Shareholders, because the statement to shareholders should conform in all material respects to the statement required in F.P.C. Form No. 1." Similarly, Johnson testified at his deposition that the disclosures in the funds statement provided to shareholders should have been the same as those made in the reports to the Federal Power Commission.

funds statement as an income item that did not produce cash, the potential investor would have learned that "total resources from operations" amounted only to $138 million instead of the $169.4 million figure reported by the company.[4]

In an apparent effort to correct this misleading figure, a footnote was added to the line for net income on the funds statement, stating that net income included amounts reported as AFDC, and referring the reader to a purported definition of AFDC contained in footnote (b) to the income statement. This footnote, which describes AFDC as an "item of non-operating income" consisting of "the net cost . . . of borrowed funds used for construction purposes and a reasonable rate upon other funds when so used," which "amounted to . . . 46% of the net income available for Common Stock . . . ," apparently satisfies the majority that a full and adequate disclosure of AFDC's non-cash nature was made. How this patent *non sequitur* serves to clarify rather than obfuscate is difficult to perceive. At most, this note simply identifies AFDC as "non-operating" income, much like the interest received on a company's marketable securities. In no sense does it inform the reader that AFDC is a non-cash source of income. Obviously cognizant of this omission, the SEC staff cautioned Detroit Edison to disclose the fact that 46% of current dividends were being paid from "non-cash earnings" rather than

"non-operating income." Indeed, both Detroit Edison's Chief Accountant and the Price Waterhouse partner who certified the financial statements presented in the prospectus admitted that neither the funds statement nor the footnote to the income statement disclosed the non-cash nature of AFDC income.

The prospectus, moreover, compounded the confusion by indicating elsewhere that AFDC was a source of cash available either for plant construction or payment of dividends. For example, on page 3 of the prospectus the company estimated that 25% of its $446 million construction program would be financed from internally generated funds, a percentage that both the appellee and my brothers concede could be derived only by inclusion of AFDC as one source of "internally generated funds."[5] The statement of retained earnings, presented on page 22 of the prospectus, also supported the impression that AFDC income was available for distribution to shareholders by neglecting to break out the AFDC component of net income. The statement simply reported net income of $85.6 million, from which $66.7 million in current dividends were paid to shareholders. Of course, the careful reader of financial statements would know that net income does not necessarily translate into cash received during the current period. Thus, to analyze properly Detroit Edison's ability to pay dividends from internally generated funds, such

4. In upholding the adequacy of Detroit Edison's presentation of AFDC income in its funds statement, my brothers claim that deduction of AFDC from net income as an item that did not produce cash would have necessitated an identical, but improper, entry "on the debit side of the balance sheet." As the Federal Power Commission's Chief Accountant clearly demonstrated in AR 10, proper presentation of AFDC as an offset to net income in the Source of Funds section of the funds statement simply necessitated the creation of a contra account to construction and plant expenditures in the statement's Application of Funds section.

5. The majority discounts the presence of this admitted error because it can find nothing in the record to indicate that the contribution of only 18% of construction costs from internal

funds, rather than 25%, would hinder the company's access to outside financing. Regardless of whether this is the case, the question before us is what would be considered material by the offerees of Detroit Edison's stock sale, not its potential lenders. No one can assert with confidence that an investor considering purchase of Detroit Edison's common stock would not view the company's significantly lower contribution to capital expansion from internally generated funds as an important factor in reaching a decision not to invest. Moreover, the inclusion of AFDC within the percentage reported as "internally generated funds" reinforces the misleading impression created by the funds statement that AFDC income provided cash available to the company during the current period.

an investor would be required to turn to the funds statement to determine what elements of reported net income did not produce cash in the current period. But, as I have noted, the funds statement offered the reader no additional assistance since it too failed to subtract AFDC from net income. The inescapable—but inaccurate—implication of both statements taken together is that Detroit Edison's net income provided more than enough cash to pay its current dividends.[6] Moreover, when these two statements are read in the context of other references to AFDC contained in the prospectus, the potential investor is led to believe that Detroit Edison's current operations produced sufficient cash to pay both its dividends and to fund 25% of its capital expansion. In truth, however, if Detroit Edison were to have financed 25% of its construction program from internally generated funds, it would have had sufficient cash remaining in fiscal 1972 to pay only 25% of dividends declared. The difference, of course, would have to be raised from additional outside financing.

It may well be, as the majority implies, that utility specialists and expert accountants were well aware of the non-cash nature of AFDC. It may even be presumed that the success or failure of Detroit Edison's offering would rest largely upon these experts' careful analyses of the prospectus, and not the untutored scrutiny of the appellant or other hapless investors. But I fail to see how any of this bears on the issue before us, namely, whether there is a substantial likelihood that a reasonable investor would consider the non-cash nature of AFDC income important in reaching an investment decision. See *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Because the failure to disclose the non-cash nature of Detroit Edison's AFDC income significantly overstated the amount of cash generated internally, and thus obscured the sources from which the company proposed to fund its cash requirements, the prospectus was materially misleading. The facts and figures presented in Detroit Edison's prospectus, as Learned Hand once remarked in another context, "merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of." L. Hand, The Spirit of Liberty 213 (I. Dilliard ed. 1960). In reaching this conclusion, I by no means suggest that corporate management must address investors "as if they were children in kindergarten." *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y. 1967). Rather, by insisting upon full and fair disclosure of any deviation from generally accepted accounting principles, I would place the risk of ambiguity upon those who create it.

6. The majority contends that the misleading impression created by the funds statement and statement of retained earnings is alleviated by the footnote to the funds statement indicating that net income included sums reported as AFDC, and referring the reader to the income statement. Upon returning to the income statement, my brothers argue, the curious reader could have deducted the amount reported as AFDC from the net income figure, turned to the statement of retained earnings, and noticed that the amount currently paid in dividends exceeded the amount of net income less AFDC. All this assumes, of course, that the curious reader skilled in such gymnastics would be able to detect that AFDC was a non-cash item of income which should be deducted from net income to discern the company's true ability to pay dividends from internally generated cash. Clearly, the majority asks too much. As the appellee's own experts testified, the prospectus nowhere discloses the non-cash nature of AFDC income.