**Morris AKERMAN and Susan Akerman, Plaintiffs,**

**and**

**Dr. Lawrence Kuhn, Intervenor-Plaintiff,**

**v.**

**ORYX COMMUNICATIONS, INC., Moore & Schley, Cameron & Co., Robertson Securities Corporation, and Laidlaw, Adams & Peck, Inc., Defendants.**

**No. 81 Civ. 7388 (ADS).**

United States District Court, S.D. New York.

Sept. 18, 1984.

Stull, Stull & Brody, New York City, for plaintiffs; Jules Brody, New York City, of counsel.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for defendant Oryx Communications; Jeffrey A. Fillman, Frederick S. Gold, Robert B. Smith, New York City, of counsel.

Rogers & Wells, New York City, for defendants Moore & Schley, Cameron & Co., Robertson Securities Corp. and Laidlaw, Adams & Peck, William F. Koegel, Timothy F. Michno, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Defendant Oryx Communications, Inc. ("Oryx"), a Delaware corporation with its principal executive offices in New York City, was incorporated on April 6, 1981, to acquire video rights to American films and to manufacture and sell video cassettes and video discs for home use abroad. Oryx was the brainchild of Steven Schiffer, an executive formerly with Columbia Pictures Home Entertainment, and Thomas Sherwood, one of Schiffer's business contacts. Oryx merged with Sherwood's company, Replicon, Inc. ("Replicon"), an exporter of Super 8 mm films, which became an Oryx subsidiary at the time of Oryx's incorporation. Sherwood had been Director/Treasurer of Replicon since 1978 and President from March 1980 until the merger a year later; he became Chairman of the Board and Treasurer of Oryx. Schiffer became Oryx's President. They hired a third officer/director, Paul Levine. Sherwood, Schiffer, and Levine planned to develop a library of home video rights and to use the existing distribution network of the Replicon subsidiary to penetrate foreign video markets.

To further these goals, Oryx sought to raise approximately $3,000,000 of capital through a public stock offering. Oryx's management filed a registration statement and an accompanying prospectus dated June 30, 1981, with the Securities and Exchange Commission ("SEC"), for a firm commitment offering of 700,000 units. Each unit sold for $4.75 and was composed of one share of common stock and one warrant to purchase common stock at a later date at $5.75.

Shortly after issue, the price of Oryx units began to decline. On July 23, the bid price stood at 4 and $\frac{2}{8}$ths. By September 23, it had fallen to 3 and $\frac{4}{8}$ths. It rallied briefly in mid-October to 4, but by October 26 it had fallen back to 3 and $\frac{2}{8}$ths where it remained until late February 1982. This represented a decline from the issue price of 23.5 percent by November 25, 1981, the date on which this suit was filed. The Over-the-Counter Composite Index for the same period fell from 214.63 on July 1, 1981, to 198.91 on November 25, a decline of 7.3 percent.

Plaintiffs alleged that the decline in Oryx's value was a result of an inaccurate prospectus and registration materials. On November 10, 1981, Oryx had publicly announced that its June 1981 prospectus and registration statement contained certain erroneous figures. This media announcement was followed by a letter to shareholders dated November 12. The innaccurate figures appeared in a pro forma unaudited financial statement entitled "Oryx Commu-

nications Inc. and Subsidiaries" and related to the eight months ending March 31, 1981. These unaudited financials stated net sales, net earnings, and earnings per share of $931,301.00, $211,815.00, and $0.07, respectively. Due to the fact that a substantial transaction had been incorrectly posted to March instead of April, these figures overstated Replicon's sales and earnings by $165,000.00, $117,286.00 and $0.04, respectively. Thus, net sales in that period were actually $766,301, net income was actually $94,529, and earnings per share were actually $0.03.

On November 25, 1981, the Akerman plaintiffs initiated this action alleging violations of section 11 and section 12(2) of the Securities Act of 1933 (codified as amended at 15 U.S.C. §§ 77k and 77l (1982)). Mr. and Mrs. Akerman had purchased 200 units of Oryx on June 30, 1981, from defendant Laidlaw, Adams & Peck, Inc. ("Laidlaw"). The complaint also named Oryx, which issued the securities, and the two firms which had managed the underwriting, Moore and Schley, Cameron and Co. ("Moore") and Robertson Securities Corp. ("Robertson"). Defendants Oryx, Moore, Robertson, and Laidlaw have moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint for lack of materiality, lack of privity under section 12(2), and absence of provable damages under section 11(e). Plaintiffs Morris and Susan Akerman have cross-moved pursuant to Rule 23(c)(1) for class certification and pursuant to Rule 15(a) to amend their complaint further to include the underwriters as a defendant class. On June 14, 1983, Dr. Lawrence Kuhn moved to intervene as a plaintiff pursuant to Rule 24, with the intention to move for class certification should his motion to intervene be granted. Dr. Kuhn purchased 7,000 Oryx units from Robertson on June 30, 1981; Robertson was later acquired by Moore.

The case is far from one of monumental significance, and the theories advanced by plaintiffs' counsel illustrate how legal ingenuity can greatly complicate securities litigation. Even after several rounds of briefing, argument, and amendments, and after the considerable efforts this opinion represents, the proper results on some of the issues presented are far from clear. Although plaintiffs showed that the statements in the Oryx prospectus were theoretically material, defendants have successfully demonstrated that the decline in the value of Oryx stock was in fact caused by factors other than the matters misstated. Plaintiffs are therefore ineligible for damages under section 11(e). Moreover, plaintiffs may proceed under section 12(2) against only those defendants who sold to them directly, because defendants not in privity with each individual plaintiff cannot as a matter of law be deemed co-conspirators or aiders and abettors on this record. Finally, while plaintiff Kuhn may intervene,[1] plaintiffs' motions to certify classes must be held in abeyance pending submission of evidence as to the number of investors who purchased from each of the named underwriters; the present record lacks sufficient evidence as to the numerosity of the potential section 12 classes.

## I. *Materiality.*

■ A fundamental purpose of the Securities Act of 1933 ("the Act") "was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Securities and Exchange Commission v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 279, 11 L.Ed.2d 237 (1963). The Act mandates disclosure of all material facts relating to the sale or offering of covered securities. As Judge Weinstein

---

1. Dr. Kuhn petitioned to intervene pursuant to Rule 24(b)(2), which allows intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 23(b)(2). Intervention in a securities class action is liberally allowed, *Nedicks Stores, Inc. v. Genis,* 34 F.R.D. 235, 237 (S.D.N.Y.1963), as long as it will not unduly delay or prejudice adjudication of the rights of the original parties. *See* 3B *Moore's Federal Practice* ¶ 24.10[4]. Kuhn's claim raises no new issues, is based on identical operative facts, and will entail little if any additional discovery.

wrote in *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 549 (E.D.N.Y.1971), "the prospective purchaser of a new issue of securities is entitled to know what the deal is all about." "Civil liability under section 11 and similar provisions was designed not so much to compensate the defrauded purchaser as to promote enforcement of the Act and deter negligence by providing a penalty for those who fail in their duties." *Globus v. Law Research Service*, 418 F.2d 1276, 1288 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970).

■ The existence of a misstatement sufficiently serious to be deemed "material" is a threshold issue in any claim under sections 11 and 12(2) of the Securities Act of 1933. The Supreme Court discussed materiality in the context of a Rule 14a–9 proxy violation in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976): "[t]he question of materiality ... is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor.... An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 445, 449, 96 S.Ct. at 2132. Courts have widely adopted this formula as the test for materiality in securities law actions. *See Alton Box Board Co., v. Goldman, Sachs & Co.*, 560 F.2d 916, 919–20 (8th Cir.1977) (§ 12(2) actions); *Elfenbein v. American Financial Corp.*, 487 F.Supp. 619, 626–27 (S.D.N.Y.1980) (§ 11 and § 12(2) actions), *aff'd*, 652 F.2d 53 (2d Cir.1981); *Greenapple v. Detroit Edison Co.*, 468 F.Supp. 702, 708 (S.D.N.Y.1979) (§ 11 actions), *aff'd*, 618 F.2d 198 (2d Cir.1980); *Straus v. Holiday Inns*, 460 F.Supp. 729, 736 (S.D.N.Y.1978) (§ 11 actions).

Defendants argue that investors who relied upon the information conveyed in the registration statement and prospectus would not have viewed Replicon's past earnings as material to the future success of Oryx and that there is consequently no genuine issue of fact as to the materiality of the overstatement of earnings. The Oryx prospectus emphasized that Oryx was an entirely new venture that would concentrate on opening video markets, and it forecast a decline in the Super 8mm business of the Replicon subsidiary. The prospectus states: "All of the Company's current sales and income are accounted for by the present Replicon business. The Company anticipates, however, that this business will decline both relative to the other activities of the Company and in absolute terms as a source of revenues and profits.... Oryx believes that as videocassettes and videodiscs acquire wider penetration in the home entertainment market the role of Super 8mm film sales in its business will diminish and, although Oryx intends to continue this aspect of the business, it expects that such sales will decline." Prospectus at 4, 13 (Defendant Oryx's Motion for Summary Judgment, Exh. C). Defendants contend that the absence of an adverse market reaction after the public announcement of the overstatements proves its view that the mistakes were immaterial.

Plaintiffs point out that, regardless of the issuer's disclaimers in text of the prospectus, Replicon was Oryx's only balance-sheet asset and accounted for almost one-sixth of Oryx's capital, even when the balance sheet was adjusted to reflect the proceeds of the June 1981 stock issue. Oryx said it intended to continue this business, thereby suggesting the continuation for at least some time of a flow of income. "There must be some point at which errors in disclosing a company's balance sheet become material, even to a growth-oriented investor." *Escott v. BarChris Construction Corp.*, 283 F.Supp. 643, 682 (S.D.N.Y. 1968). Whether an error in balance sheet figures is material depends largely on the surrounding circumstances. In *BarChris*, the company's balance sheet depicted a current assets to liabilities ratio of 1.9 to 1 when the actual ratio was 1.6 to 1. *Id.* Although the *BarChris* court applied a more stringent standard of materiality—whether the fact, had it been correctly stated, "would have deterred or tended to deter" investment, *id.* at 681—it held that

this variance was material, even though an overstatement of the net earnings per share in previous years was nonmaterial because it was relatively unimportant to the growth-oriented investor. *Id.* at 681–82.

As we have already seen, the figures published by Oryx were significantly overstated, the earnings per share by over one hundred percent. Moreover, the true figures reveal that Replicon's performance as a seller of Super 8mm films had declined sharply; net earnings, for example, had plummeted from $270,112 in the eight months ending March 31, 1980, to $94,529 in the comparable period ending March 31, 1981. A reasonable investor presented with these figures might well have questioned whether Replicon's management was capable of carrying forward its plan, outlined in the Oryx prospectus, of building a video business by capitalizing on Replicon's contacts and its president's experience in the industry. *See Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 643–45 (D.Del.1980) (finding that failure to disclose first quarter losses in proxy materials is material since it bears upon management's credibility).

■ Nor can the lack of a significant drop in the price of Oryx's stock after disclosure by itself establish immateriality as a matter of law. The price of a thinly traded over-the-counter new-issue stock such as Oryx cannot always be counted on to respond to such an announcement. As Judge Weinfeld has said: "The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20–20 hindsight view long after the event." *Spielman v. General Host Corp.*, 402 F.Supp. 190, 194 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 39 (2d Cir.1976).

## II. *Damages under Section 11.*

■ Although plaintiffs may be correct, as a theoretical matter, that the kind of statement Oryx made in its prospectus can be material within the meaning of section 11, they have failed to show that Oryx's statements were in fact material, in other words, that they caused whatever losses plaintiffs may have suffered. Thus, plaintiffs are not entitled to any recovery on their section 11 claims.

Section 11 imposes civil liability for any materially untrue or misleading statements in registrations on "every person who signed the registration statement ... [and] every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1) and (5) (1982). As the issuer, Oryx is strictly liable without regard to *scienter.* The statute offers three alternative measures of damages: (1) the difference between the amount paid for the security and its value at the time suit is brought; (2) the difference between the purchase price and the price at which the security was disposed of in the market prior to suit, or (3) the difference between the purchase price and the price for which the security is sold after suit, as long as this does not exceed the difference between the purchase price and the price at the time of suit. *See Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 203 n. 9 (2d Cir.1980). Section 11(e), however, expressly allows a defendant to limit his liability by showing that the drop in market price is unrelated to the material misstatements:

[I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e) (1982). Thus, the statute recognizes that there may be cases in which a misstatement is material to an investor's decision although it has not in fact adversely affected the value of the stock. Moreover, "[c]ase law [and] commentators ... agree that [a stock's] "realistic value may be something other than market price, where the public is either misinformed or uninformed about impor-

tant facts relating to the defendant-offeror's well being." *Beecher v. Able*, 435 F.Supp. 397, 404 (S.D.N.Y.1977).

Plaintiffs have offered the affidavit of an expert, John Hammerslough, who argues that their entire out-of-pocket loss is attributable to the earnings misstatement.[2] He bases his opinion, however, on allegations that go far beyond the claims in plaintiffs' original or proposed amended complaints, and relies on factors inapposite to a section 11(e) defense. Hammerslough concludes: "[i]t is my opinion that if the misstatements and omissions had been revealed prior to the effective date of the Prospectus, the underwriters and the investing public would have concluded that management was either grossly incompetent or fraudulent and, the underwriting would have been cancelled, the investments by plaintiffs and others would not have been made, and the damages would not have been incurred." Hammerslough Affidavit (May 25, 1983), at 10–11. Such observations, however accurate, do not rebut a section 11(e) defense. That section does not focus on the causal relationship between the misstatement and the original purchase, but rather on the relationship between the misstatement and any subsequent decline in value.

It is true that courts construing other provisions of the securities laws, especially intentional or reckless misrepresentation under Rule 10b–5 and Section 10(b) of the Exchange Act of 1934, have "borrowed [a remedy] from the tort action of deceit," *see Harris v. American Investment Co.*, 523 F.2d 220, 224–25 (8th Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976), and have given plaintiffs their out-of-pocket losses on the theory that "but for" the factual misrepresentation that induced the transaction, no losses would have been incurred. Courts in such cases have occasionally allowed full recovery despite evidence that the actual decline in value was caused by factors other than the factual misrepresentations at issue. *See, e.g., Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir.1970). Adopting such reasoning in a section 11 claim, however, would negate the clear import of subsection (e). It would force defendants to compensate plaintiffs for their entire loss whenever plaintiffs could show a causal link between a defendant's conduct and the transaction resulting in plaintiffs' damage, rather than imposing liability only when defendants could not disprove the presumed causal link between the untrue fact and the "depreciation in value" of the security.

Recent Supreme Court rulings require strict interpretation of the liability provisions of the securities acts, especially where, as here, the meaning of the statutory language is plain. *See, e.g., Dirks v. Securities and Exchange Commission*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *Chiarella v. United States*, 445

**2.** Plaintiffs have moved to include this affidavit in the record, though it is replete with conclusions of law unsupported by fact. The Hammerslough affidavit was submitted in evidence not only in this action but in a related action, *Bloom and Levine v. Sherwood, Schiffer, and Oryx Communications, Inc.*, 83 Civ. 2525. In addition to Section 11 and 12(2) claims, the *Bloom* plaintiffs asserted claims under Section 10(b) of the Exchange Act of 1934, as well as shareholder derivative claims against Oryx's officers, alleging intentional deception and fraud and wasting of corporate assets. In September, plaintiff Paul Levine, himself an Oryx officer and shareholder, signed a stipulation of settlement withdrawing his claims in *Bloom* as well as in a separate breach of contract action against Oryx; plaintiff Bloom thereafter refused to appear for depositions and on March 15, 1984 the court dismissed the remaining claims *sua sponte* for lack of prosecution, lack of a proper plaintiff, and other reasons stated on the record. To date, neither the Akermans nor Dr. Kuhn has formally asserted either Section 10(b) or derivative claims. Given Bloom and Levine's reluctance to prosecute their case, and the absence of identity between the parties, the claims, or even the counsel involved in the two cases, the court declines to give effect to plaintiffs' bare assertion that "[t]he Akerman plaintiffs join in the allegations contained in the companion action of *Bloom and Levine v. Sherwood et al.*, 83 Civ. 2525 (ADS) and the papers submitted therein." Affidavit of Jules Brody (May 23, 1983), at 6. That case has been dismissed, and papers prepared and signed by other counsel, based on affidavits by strangers to this litigation and served on different parties, may not simply be incorporated by reference into this action.

U.S. 222, 227–30, 100 S.Ct. 1108, 1114–15, 63 L.Ed.2d 348 (1980) (restricting definition of insider trading); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471–77, 97 S.Ct. 1292, 1299–1302, 51 L.Ed.2d 480 (1977) (restricting § 10 actions to cases involving "manipulation" or "deception"); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 24–42, 97 S.Ct. 926, 940–949, 51 L.Ed.2d 124 (1977) (refusing to allow tender offerors to sue under § 14(e)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197–215, 96 S.Ct. 1375, 1382–1391, 47 L.Ed.2d 668 (1976) (§ 10(b) violations require *scienter* ); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733–49, 95 S.Ct. 1917, 1924–31, 44 L.Ed.2d 539 (1975) (limiting § 10 actions to purchasers and sellers of securities). These decisions reflect the belief that Congress carefully tailored the several remedies of the securities acts to serve varying goals; courts must be wary of expanding them or of indiscriminately choosing among them. Section 11, for example, imposes liability without fault on issuers; simple negligence is enough to establish liability on the part of underwriters. The finely tuned section 11(e) test of depreciated value operates as a brake on the potentially unlimited scope of the damages that could result from these standards. Plaintiffs' suggested adoption of the far broader section 10(b) transaction-loss theory traditionally reserved for cases of deceit and fraud is the sort of analytical borrowing prohibited by the relevant authorities.

Defendants' motion for judgment on this claim was originally based on a showing that there was no decline in the value of Oryx's securities after the public disclosure on November 10 of the error in its prospectus. A market decline after the announcement of an error is the most obvious evidence of a causal relationship between a misstated fact and a stock's inaccurate valuation. Generally speaking, if the market initially overvalues a stock due to erroneous information, the price will drop upon disclosure to a level that "represents the consensus of buying and selling opinion of the value of the securities as they actually are." *Harris,* 523 F.2d at 226 (quoting Restatement of Torts § 549, comment c); *cf. Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 577 (2d Cir.) (actual response of market must be taken into account in evaluating damages under § 10(b)), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982).

In this case, Oryx stock remained stable in the two-week period between disclosure and the filing of this suit, and for several months thereafter. NASDAQ records indicate that the market price of Oryx units rose one-quarter point in the period between the day before the public announcement and November 25, 1981, the date of suit. From November 25 into the third week of February 1982, the price of Oryx units remained slightly above or slightly below the price at the date of suit. *See* Berson Reply Affidavit (March 7, 1983), at 4–5; Exhibits to Hammerslough Reply Affidavit (Dec. 14, 1983). No evidence exists of panic selling; moreover, discovery established that the three stockholders who sold to Moore during November had decided to sell before the announcement or did not know of the correction. *See* Berson Reply Affidavit at 7. The volume of Oryx stock traded in November 1981, December 1981, and January 1982, adjusted for seasonal differences, was comparable to that of October.

Plaintiffs sought to create a disputed issue of fact, despite this showing, by speculating that Moore used its position as market maker to prop up the market after public disclosure and prevent the price from dropping. Discovery has shown otherwise. From November 10, the date of public announcement, to the end of November, Moore sold more Oryx shares than it bought. *See* Berson Reply Affidavit at 8.

Plaintiffs seek alternatively to claim injury based upon depreciation in the stock's price *prior* to public disclosure of the erroneous information. This argument has at least possible theoretical validity, since disclosure of an error to a group of underwriters, for example, could enable them to force down the price of the stock involved

prior to the public disclosure that would put plaintiffs on notice. In this case, the bid price of Oryx fell from $4.00 on October 19 to $3.25 on November 9, the day before the public correction. Plaintiffs attempted to connect this depreciation to the activities of certain corporate officers, SEC officials, accountants, and attorneys who were informed of the misstatements in the course of Oryx's internal investigation during October and early November. After extensive discovery, however, plaintiffs failed to uncover any evidence of insider trading, premature disclosure to investors, or stock manipulation. Plaintiffs also speculate that Moore, as market maker, may have acted to depress the price of Oryx units, but their submissions have failed to "set forth specific facts showing that [this] is a genuine issue for trial." Fed.R.Civ.P. 56(e). If anything, market makers are likely to be interested in maintaining an artificially high price. See 3B H. Bloomenthal, Securities and Federal Corporate Law §§ 12.07 to 12.11 (1983). Moreover, those persons at Moore who knew of the error affirm that they purposely did not communicate it to Moore's sales personnel until after the November 10 public announcement. See Berson Affidavit (Jan. 20, 1983), at 4–5. The evidence at hand forces the conclusion that any decline prior to November 10 was unrelated to disclosure to this limited circle of insiders.

Plaintiffs' only evidentiary support for their claim that the untrue statement sued upon caused a decline in value comes from the fact that the way in which the value of Oryx units declined prior to the public announcement was allegedly inconsistent with the rest of the market's movement during the same period. During the period when the bid price of Oryx fell 19% (from $4.00 on October 15, when the SEC was informed of the error, to $3.25 on November 10), the Over-the-Counter Composite Index rose almost 5.3% from 189.85 to 199.90, a spread of over 24 percent. Hammerslough Affidavit (May 25, 1983), at 11. Defendants initially answered this by arguing that the predisclosure decline was attributable to factors other than the misstatement and its pre-disclosure discovery. They pointed to a general decline in the stock market during the broader period of June ·31, 1981 to November 1982, as well as to such more specific facts as the widespread piracy of video tapes, the default of one of Oryx' major suppliers of video rights, and the loss of foreign markets due to the international monetary crisis. They contended that these all contributed to Oryx's initial poor performance.

No doubt many independent factors contributed to the stock's decline. Cf., e.g., Beecher v. Able, 435 F.Supp. at 407 (finding that preannouncement drop in value was due to general economic factors); Feit, 332 F.Supp. at 586 (taking "market decline" into account in determining damages); see also Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77, 81, 84 (2d Cir. 1980) (reducing recovery against § 10(b) aider and abettor by formula representing general market decline). The influence of general market factors, however, entitles defendants only to an appropriate reduction of damages. To prevail on this summary judgment motion, which seeks dismissal of the section 11 claims, defendants face "an especially high burden; they [must] prove that the decline in value of [Oryx] stock resulted 'solely' from factors other than the material omissions [or misstatements]." Collins v. Signetics Corp., 605 F.2d 110, 115–16 (3rd Cir.1979) (emphasis added). As the Supreme Court recently remarked in regard to standards of proof under the securities acts, burdens of proof "serv[e] to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision," in terms of the public interest as well as the private plaintiff's interest. Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (quoting Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979)). The legislative choice to impose the burden of proof on defendants under section 11(e) represents a judgment that the risk of any uncertainty as to causality must fall upon defendants in or-

der to insure the full disclosure that is the primary goal of the Act. Plaintiffs are in effect entitled to a rebuttable presumption that the decline was related to the nondisclosure. *See, e.g.,* 3A H. Bloomenthal, § 8.26[3] at 8–75.

Although defendants failed in their more general attack on the significance of the alleged discrepancy in performance of the Oryx stock, the court offered them an opportunity to prove by expert, statistical analysis that the alleged discrepancy had insufficient significance to create a genuine issue of material fact. Defendants have since offered convincing proof that the variance is statistically irrelevant. Professors Cyrus Derman and Morton Klein of Columbia University conducted an exhaustive computer analysis of the performance of the stock of the other one hundred companies which went public during May and June of 1981. They found that many other new issue securities suffered equal or greater declines in value between June 1 and November 25, 1981. Oryx, in fact, performed exactly at the statistical median. Derman Affidavit (June 26, 1984) at 3; *see also* Derman Affidavit, Exh. 1 (Statistical Analysis) at Exhs. A & B. An additional statistical test indicated that Oryx's stock "behaved over the entire period in a manner consistent with its own inherent variation." Derman Affidavit, Exh. 1 (Analysis 3/Test 2). Plaintiffs were afforded thirty days to respond to this analysis; they have failed to rebut defendants' evidence persuasively.

Thus, on the record before the court, defendants are entitled to summary judgment on the issue of section 11(e) liability. They have carried their heavy burden of proving that the decline was caused by factors other than the matters misstated in the registration statement. *See* Schwarzer, *Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 472, 481 (1983) (when evidence would compel a directed verdict or judgment notwithstanding the verdict, there is no "genuine" issue of disputed fact and summary judgment is appropriate). Although plaintiffs initially carried their "minimal burden" of establishing a *prima facie* case by showing materiality, defendants have come forward with a credible, factually supported demonstration of the lack of any connection between the drop in value of Oryx securities and the misstatements. After extensive discovery, plaintiffs have failed to substantiate any of the theories they offered in rebuttal to connect the decline in value to the untruth of the registration statement.

III. *Section 12(2) Privity Requirement.*

Unlike section 11, which permits the imposition of liability on a broad range of parties, section 12(2) only imposes liability on persons who "offe[r]" or "sel[l]" securities and only grants standing to "the person purchasing such security" from them. 15 U.S.C. § 77*l*(2) (1982). Defendants claim that persons other than the immediate seller do not "offer" or "sell" within the meaning of the statute. Defendants contend the offering was a "firm commitment underwriting"—one in which the Oryx underwriters, rather than acting as agents of the issuer, purchased units from the issuer to resell to the public; they argue that under such an arrangement the issuers and underwriters bear liability only for sales made directly by them. *See Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 222 (S.D.N.Y.1973) (contrasting liability for "firm commitment" with liability for "best efforts" underwriting).

The front page of the prospectus covering the Oryx offering states "the Units are offered on a firm commitment basis by the Underwriters subject to receipt and acceptance of such shares by them, subject to the approval of certain legal matters by counsel and subject to prior sale. The Underwriters reserve the right to withdraw, cancel or modify the offering and to reject any order in whole or in part." Prospectus at 1 (Defendant Oryx's Motion for Summary Judgment, Exh. C). The underwriting agreement also specifies that "the Company hereby agrees to sell to Each Underwriter, and Each Underwriter agrees, severally and not jointly,

to purchase from the Company at a purchase price of $4.275 per unit the respective number of units...." Underwriting Agreement ¶ 3, at 14 (Oryx's Responses to Plaintiff's Interrogatories (Aug. 21, 1982), Exh. A). The fact that the underwriters purchased the stocks at a discount, profiting on their resale rather than by earning a commission, also indicates a firm commitment underwriting as opposed to an agency relationship. *See Demarco v. Edens,* 390 F.2d 836, 844 (2d Cir.1968). "[A]bsent a proven agency or a 'control' under Section 15, a purchaser of stock may sustain an action under Section 12 against his immediate seller only." *Id.* at 841 n. 3; *see Collins v. Signetics Corporation,* 605 F.2d at 113 (same). The only suits that could be permitted to proceed on this theory are the Akerman plaintiffs' suit against Laidlaw, which sold them 200 units of Oryx, and Dr. Kuhn's claim based on his purchase of 7,000 Oryx units from Robertson, which was later acquired by Moore.

Plaintiffs contend, however, that the issuer and participating underwriters are subject to liability under section 12(2) as co-conspirators or aiders and abettors. The doctrine imposing secondary liability on co-conspirators and aiders may be traced to *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1053–55 (2d Cir.1969), and *In Re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 378–80 (S.D.N.Y.1973) ("persons who do no more than ... aid and abet ... are not necessarily ... excluded from the imposition of § 12(2) liability."); *see also Hill York Corp., v. American International Franchises Inc.,* 448 F.2d 680, 692–93 (5th Cir.1971) (employing "proximate cause" test rather than "strict privity" requirement). Under these decisions, liability may be imposed on "persons who are aware of and, to some lesser degree, participate in a violation of [section 12(2) ] and either enter into an agreement with or give assistance to the wrongdoers...." *Id.* at 383. Plaintiffs construe this language to encompass the activities of the issuer and underwriters. Plaintiffs have cited no cases, however, in which these theories have been applied to subject participating underwrit-

ers or an issuer whose securities were sold pursuant to a firm commitment underwriting to section 12 liability for sales effected by other participating underwriters. *Katz v. David W. Katz & Co.,* 1984 Fed.Sec.L. Rep. (CCH) ¶ 99,669 (S.D.N.Y.1984), concerned an attorney who allegedly participated directly in the sale. Judge Sand explicitly stated that a "plaintiff, at mimimum, must show some meaningful participation in an 'offer or sale' on the part of those charged with Section 12 liability." *Id.* at 97,687. *See also Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir.1981) (defendant who was "two steps removed" from sale does not engage in "sufficient degree of participation" for § 12(2) liability); *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980) (defendant must be "substantial factor" rather than someone who "mere[ly] particip[es]"); *Lawler v. Gilliam,* 569 F.2d 1283, 1287–88 (4th Cir.1978) (same); *Lewis v. Walston & Co.,* 487 F.2d 617, 622 (5th Cir.1973) (finding defendant liable because she "touted ... stock heavily to the plaintiffs"). In *Admiralty Fund v. Jones,* 677 F.2d 1289, 1294 n. 4 (9th Cir.1982), not only did the court require knowledge and significant participation but it went on to remark that in the context of section 12(2) the broad reading given to the term "seller" in *In re Caesers Palace* may merit reexamination in light of recent Supreme Court decisions prescribing "a strict statutory construction approach to the securities acts" and rejecting expansion through the use of tort and criminal principles.

At least one court has explicitly rejected the idea that participation in an underwriting syndication is tantamount to aiding, abetting, or conspiring in subsequent individual sales. *See In re the Gap Stores Securities Litigation,* 79 F.R.D. 283, 307 (N.D.Cal.1978). In his analysis, Judge Williams examined the practical ramifications of using section 12(2) to subject each participating underwriter to liability because he "caused each of the sales simply by his membership in the underwriting syndicate." *Id.* To thus stretch the statute's language would mean that "[n]one of the

individual underwriters would have their liability limited to the shares they actually sold, and the aggregate underwriter liability might well exceed the total value of the underwriting if open market and original issue purchasers were all allowed to rescind their purchases or obtain compensatory damages." *Id.* The prospect of thousands of purchasers demanding their rights of rescission under section 12 from underwriters and issuers who never sold to them is strong reason to interpret the aiding and abetting and conspiracy theories to encompass only persons who participate in some more direct way in the individual sales transaction. *See, e.g., McFarland v. Memorex Corp.*, 493 F.Supp. 631, 648 (N.D. Cal.1980) (plaintiff cannot present to defendant for repurchase securities which defendant never owned); *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 554 (5th Cir.1981) (use of rescission as remedy limited to cases involving privity or special fiduciary duty), *aff'd in part, rev'd in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Even with the aid of exhaustive discovery, plaintiffs are unable to proffer any evidence that Oryx was involved in any manner beyond its role as issuer in the actual sales to plaintiffs, or that Oryx or the other underwriters aided, abetted, or conspired in transactions effected by the immediate sellers. In *Lorber v. Beebe*, 407 F.Supp. 279 (S.D.N.Y.1975), Judge Knapp reversed his earlier denial of an issuer's motion for summary judgment on section 12(2) liability, remarking that "unsworn, conclusory allegations of 'conspiracy' and 'aiding and abetting'" were insufficient grounds for denial of a Rule 56 motion. *Id.* at 295; *cf. Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co.*, 518 F.Supp. 1302, 1309 (C.D.Ill.1981) (conclusory allegations insufficient to sustain fraud allegations); *McFarland v. Memorex Corporation*, 493 F.Supp. at 647 (under section 12(2) mere allegation of conspiracy or aiding and abetting will not suffice). Oryx and the defendant underwriters are entitled to summary judgment on the issue of their liability under section 12(2) except that the underwriters may be sued individually by those plaintiffs who purchased directly from them.

## IV. *Class Certification Issues*

Plaintiffs have moved for certification as representatives of a plaintiff class, and Dr. Kuhn has indicated his intention to so move if he is permitted to intervene. Plaintiffs also wish to amend their complaint further to clarify that Moore and Robertson are being sued as representatives of all the defendant underwriters, and therefore that each member of the proposed class of all purchasers under the June 30, 1981 Oryx prospectus can pursue his remedies against a class composed of all the underwriters. Rule 23(c)(1) requires the court to determine as early in the proceeding as possible whether an action brought as a class action may be so maintained.

1. *Proposed class of defendant underwriters.* "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In addition, a class action must satisfy one of the prerequisites of Rule 23(b). In this case, plaintiffs assert that questions of law or fact common to the members of the proposed class predominate over questions affecting only individual members. Fed.R. Civ.P. 23(b)(3).

■ Although Rule 23 provides for defendant as well as plaintiff classes, certification of defendant classes is relatively rare. *Thillens, Inc. v. Community Currency Exchange Association*, 97 F.R.D. 668, 674 (N.D.Ill.1983). The creation of defendant classes raises due process issues not encountered in the context of plaintiff classes. As one court has put it, "[t]he crux of the distinction is: the unnamed plaintiff stands to gain while the unamed

defendant stands to lose." *Id.* Before certifying a defendant class, the court must carefully examine the impact of such certification on the rights of unnamed class members. This determination in turn depends on the nature of the various claims asserted and the statutory scheme of remedies. Although several courts have permitted certification of a defendant class of underwriters in Section 11 claims under the Securities Act of 1933, *see e.g., In re Itel Securities Litigation,* 89 F.R.D. 104, 109–14 (N.D.Cal.1981); *In re the Gap Stores Securities Litigation,* 79 F.R.D. at 302–06, section 11 gives any person acquiring a security a right of action against, among others, the issuer and *any* underwriter. Section 12(2), by contrast, gives a right of action only against the purchaser's immediate seller. This privity requirement has a substantial effect on the availability of class action procedures to litigate such claims. Courts have differed as to whether a class of plaintiffs representing all purchasers may assert Section 12(2) claims against a class encompassing defendants with whom they were not in privity. *Compare In re Itel,* 89 F.R.D. at 114–23 (permitting certification of defendant class of underwriters in § 12(2) claim); *with In re the Gap,* 79 F.R.D. at 307 (refusing to certify defendant class on § 12(2) claim). The majority of courts grappling with the issue, including several in this district, have concluded that a defendant class generally should not be certified unless each member of the plaintiff class has a colorable claim against each member of the defendant class. *See, e.g., Thillens Inc.,* 97 F.R.D. at 675; *In re Itel,* 89 F.R.D. at 120; *Vulcan Society v. Fire Department,* 82 F.R.D. 379, 398–99 (S.D.N.Y.1979); *In re the Gap,* 79 F.R.D. at 307.

Several of these courts recognize an exception to this rule, however, where "[a]n important legal relationship uniting the defendant underwriters and justifying class treatment" is shown to exist. *In re Itel,* 89 F.R.D. at 121. Although the *Itel* court found that certification of a defendant class for the litigation of Section 11 claims provided a sufficient "juridical link" to just-

ify similar class treatment of Section 12(2) claims, a juridical link sufficient to confer standing generally must stem from an independent legal relationship. Partnership, joint enterprise, control, conspiracy, and aiding and abetting all may serve as such a link, since they denote some form of activity or association on the part of the defendants that warrants imposition of joint liability against the group even though the plaintiff may have dealt primarily with a single member. *See* Note, *The Juridical Links Exception to the Typicality Requirement in Multiple Defendant Class Actions: The Relationship Between Standing and Typicality,* 58 B.U.L.Rev. 492, 495 (1978). *See also Mudd v. Busse,* 68 F.R.D. 522, 528 (N.D.Ind.1975) (citing cases in which defendant class actions were permitted because all the individual defendants were charged with acting pursuant to state policy), *complaint dismissed,* 437 F.Supp. 505 (N.D.Ind.1977). No such juridical link exists in the present case warranting an exception to the requirement that each plaintiff have standing to sue each defendant.

A number of commentators have argued against an overly rigid application of standing principles in the context of class action litigation. *See Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1466–71 (1976); Note, *Defendant Class Actions,* 91 Harv.L.Rev. 630, 638 & n. 48 (1978). Certainly, many of the prudential concerns traditionally associated with the standing doctrine are met as long as at least one plaintiff who is clearly an injured party sues at least one defendant who has caused him injury. As critics of a high standing threshold in class actions have pointed out, the Rule 23 requirements of adequacy of representation and typicality of claims ensure a vigorous and focused litigation of the common issues even though the named plaintiff may not have a cause of action against each named defendant. *See* Note, 91 Harv.L.Rev. at 638 n. 48. Commentators note that the Supreme Court has relaxed another aspect of justiciability—the mootness requirement—in

class actions challenging constitutional violations that are capable of repetition but which would evade review if the mootness doctrine were strictly construed. *See Sosna v. Iowa,* 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–559, 42 L.Ed.2d 532 (1975). In such situations, it has permitted class-action litigation to run its course in spite of the mooting of a named party's claim.

Courts have also shown a willingness to find that named plaintiffs have standing to sue a class encompassing some defendants against whom they individually might not have a cause of action on the ground that the plaintiff class as a whole has been victim of a unified governmental policy carried out by the individual defendants. *See, e.g., Marcera v. Chinlund,* 595 F.2d 1231, 1238–39 (2d Cir.1979), *vacated on other grounds,* 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979); *Samuel v. University of Pittsburg,* 56 F.R.D. 435, 439 (W.D.Pa. 1972); *see also Mudd v. Busse,* 68 F.R.D. at 528 (collecting cases). These opinions do not, however, herald a new era in which "the class will be allowed to replace the individual as a relevant actor for article III purposes," *Developments,* 89 Harv.L.Rev. at 1470, but rather they acknowledge that each member of the class is *in fact* injured by the concerted action of the defendants in enforcing a unified policy.[3]

■ No such "unified policy" links the defendants in this case. A defendant class may not be certified simply on the ground that underwriters distributed identical printed matter to securities purchasers. Nor does justice demand a lowering of the justiciability threshold in order to permit vindication of constitutional claims, as was

the case in *Sosna.* Finally, as noted with respect to the section 11(e) damages issue, courts must be careful of expanding the substantive rights conferred by the securities acts. Certification of a defendant class of underwriters for purposes of the section 12(2) claims would effectively eliminate the privity requirement and subject any underwriter to suit by any purchaser.

■ Membership in a plaintiff class is similarly insufficient to mitigate a lack of individual standing. The fact that plaintiffs seek certification as representatives of a class at least one of whose members most probably will have purchased from each of the proposed defendant underwriters in no way alters the fundamental requirement that each plaintiff have standing to sue each defendant. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 1925 n. 20, 48 L.Ed.2d 450 (1976) (class action adds nothing to question of standing and plaintiffs may not rely on injury to unidentified members of class to establish their standing to represent class). "[A] predicate to [a plaintiff's] right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class." *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 734 (3rd Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971). *See Sosna v. Iowa,* 419 U.S. at 403, 95 S.Ct. at 559; *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978) (Friendly, J.); *Investors Funding Corporation of New York v.*

---

**3.** In *Marcera,* Judge Kaufman authorized certification of a single, statewide class of plaintiff inmates and a single class of 42 defendant county sheriffs to litigate the constitutionality of denials of contact visitation in county jails. Technically speaking, the inmates of one jail had no standing to sue sheriffs of other counties in which they were not incarcerated. Judge Kaufman observed, however, that the plaintiffs' claims differed in no material respect from a challenge to a statewide regulation, since the 42 sheriffs involved had adopted identical policies and had previously brought a joint action to enjoin enforcement of the state-imposed rule

mandating contact visitation. *Id.* 595 F.2d at 1238. In sum, the *Marcera* court treated the sheriffs as a unified group acting in concert and thus open to suit as a defendant class by representatives of the class of injured plaintiffs. Moreover, since declaratory and injunctive relief were sought against all defendants, Judge Kaufman characterized the action as a proper defendant class action under the rubric of Rule 23(b)(2), which provides for class action suit against a defendant who refuses to act on grounds generally applicable to the plaintiff class. *Id.* at 1238 n. 10.

*Dansker,* 523 F.Supp. 533, 557–58 (S.D.N. Y.1980). The procedural expedient of plaintiff class certification should not be mistaken for the sort of legal relationship that confers standing on representatives to litigate the claims of individual members. *Cf. Vulcan Society,* 82 F.R.D. at 390–92 (firefighters' association has standing to represent its members' interests in civil rights litigation.) In *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 694–95 (E.D.Pa.1973), Judge Newcomer stated that a plaintiff "may not use the procedural device of a class action to boot strap himself into standing he lacks under the express terms of the substantive law.... The plaintiff's standing to bring an action against each defendant named in the Complaint must be established independently of Federal Rule of Civil Procedure 23. Only then is a plaintiff in a position to represent others having similar claims against those same defendants."

The reasoning of the *Weiner* court has been expressly adopted in this district. *See Vulcan Society,* 82 F.R.D. at 399; *Leonard v. Merrill Lynch, Pierce, Fenner & Smith,* 64 F.R.D. 432, 435 (S.D.N.Y.1974). *See also* 3B Moore's Federal Practice ¶ 23.04[2] (2d ed. 1982). In *Vulcan Society,* firefighters from a number of municipalities sought certification of a class of plaintiffs composed of all victims of past and present discrimination by municipalities located in Westchester County. The defendant municipalities opposed class certification, arguing that each plaintiff's claim was separate and that "a plaintiff from one municipality has no cause of action against another municipality from whom that plaintiff has suffered no injury." 82 F.R.D. at 398. Judge Sweet agreed. Instead, he permitted joinder of the various municipalities as individual defendants and conditionally certified subclasses of plaintiffs composed of all those with claims against each individual municipality. In *Leonard,* plaintiffs asserted section 12(1) claims under the Securities Act of 1933 against a broker who was not their immediate seller, arguing that "some as-yet-unnamed member of the [plaintiff]

class may have purchased" from that defendant. 64 F.R.D. at 434. The court rejected this argument, noting that Rule 23 may not " 'abridge, enlarge or modify any substantive right.' " *Id.* (quoting 28 U.S.C. § 2072). The *Vulcan Society* and *Leonard* courts rightly concluded that representative plaintiffs must have standing to assert claims against all members of a defendant class; thus, the utility of class actions in the section 12(2) context is limited to class certification of subclasses of plaintiffs each of whom purchased from the same underwriter. In the absence of agency, control, or conspiracy among the defendant underwriters and Oryx in regard to the sales transactions, the Akerman plaintiffs have standing under section 12(2) only to represent a class of those who purchased from their immediate seller, defendant Laidlaw. Likewise, Dr. Kuhn has standing only to sue on behalf of those who bought from sellers, Moore and Robertson.

2. *Certification of plaintiffs as class representatives.* The issue remains whether to certify these plaintiffs as class representatives. Judicial sentiment overwhelmingly favors utilizing the expedient of class representation for plaintiffs claiming securities law violations. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir. 1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Esplin v. Hirschi,* 402 F.2d 94, 101 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Wolfson v. Solomon,* 54 F.R.D. 584, 589 (S.D.N.Y. 1972). The class action device furthers both the compensatory and the deterrent goals of the federal securities acts. *Dolgow v. Anderson,* 43 F.R.D. 472, 487 (E.D. N.Y.1968), *rev'd on other grounds,* 438 F.2d 825 (2d Cir.1971). Before plaintiffs can be certified as class representatives, however, they must fulfill every requirement of Fed.R.Civ.P. 23(a), and one requirement of Rule 23(b). *Green,* 406 F.2d at 298; *Sicinski v. Reliance Funding Corp.,* 82 F.R.D. 730, 734 (S.D.N.Y.1979).

In accord with the requirements of 23(a)(2) and 23(a)(3), questions of law or fact common to the class clearly exist and plaintiffs' claims are typical of the class. The alleged misstatements in the Oryx registration statement and prospectus are common to the class and the materiality of the misstatements is an important common issue. *See Korn,* 456 F.2d at 1210; *Green,* 406 F.2d at 299. Plaintiffs' claims are identical to those of other members of the class, and they allege a "common nucleus of operative facts." *Mersay v. First Republic Corp.,* 43 F.R.D. 465, 468 (S.D.N.Y. 1968) (quoting *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722, 726 (N.D.Cal.1967)). Plaintiffs' claims as to the underwriter's liability are typical of the class they wish to represent and it .is this typicality which is the focus of 23(a)(3). *See Sanders v. Faraday Laboratories, Inc.,* 82 F.R.D. 99, 101 (E.D.N.Y.1979).

██ Subsection (a)(4) of Rule 23 requires the plaintiffs fairly and adequately to protect the interests of the class. The adequate-representation requirement is satisfied by a commonality of interests between representatives and class members and vigorous prosecution by plaintiff and plaintiffs' counsel. *Gonzales v. Cassidy,* 474 F.2d 67, 72 & n. 10 (5th Cir.1973); *Madonick v. Denison Mines Limited,* 63 F.R.D. 657, 659 (S.D.N.Y.1974); *Herbst v. Able,* 47 F.R.D. 11, 15 (S.D.N.Y.1969); *Mersay,* 43 F.R.D. at 469; *Dolgow,* 43 F.R.D. at 494. Defendants argue that the Akerman plaintiffs cannot fairly and adequately represent the proposed class because they sold their Oryx units on September 15, 1982 (after institution of suit but before judgment), while some members of the class may still be holders of Oryx securities. Defendants reason that the Akerman plaintiffs consequently will seek the largest recovery possible from Oryx while those members of the class who retain an equity interest in Oryx will view a large recovery as inimical to their interests.

██ This argument has generally been held insufficient to defeat class certification. A plaintiff "who has acquired and retained securities ... can 'fairly and adequately' represent those who purchased securities and thereafter sold them—and vice versa." *Herbst,* 47 F.R.D. at 15; *see also Greene v. Emersons Limited,* 86 F.R.D. 47, 61 (S.D.N.Y.1980). Adoption of defendants' argument would greatly diminish the efficacy of class actions. Furthermore, defendants' argument is premature, since this purported conflict is not yet apparent. *See Feder v. Harrington,* 52 F.R.D. 178, 182 (S.D.N.Y.1970). The court retains the power to certify representatives of subclasses of those who continue to hold their shares and of those who have sold their shares should it appear that the interests of the two groups seriously diverge. *See* Rule 23(c)(4). In any event, the members of the class will voice their approval or disapproval of the plaintiffs' representation through the mechanism of Rule 23(c)(2), which provides an opportunity for voluntary exclusion from the class. Finally, there is no indication that plaintiffs or plaintiffs' counsel lack the vigor or commitment to prosecute this action. Plaintiffs have indicated a capacity and willingness to bear the cost of notice if necessary and plaintiffs' counsel is experienced in this area of litigation. It should also be noted that the able counsel that litigated the related *Bloom* action have indicated an intention of joining as co-counsel in this case. The court finds plaintiffs and their counsel to be adequate to represent the interests of the proposed plaintiff class.

Plaintiffs must also satisfy one subsection of 23(b)—in this case 23(b)(3) which requires that "questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." These requirements are clearly satisfied. The common questions as to the defendants' liability in this case present a particularly "appealing situation for a class action." Advisory Committee Notes to Rule 23 (1966 Amendments, subdivision (b)(3)). Courts have held that "common

questions predominate where ... there is a single written document charged with important ommissions." *Korn,* 456 F.2d at 1212. Defendants contend that individual determinations as to damages prevent the common questions from predominating. This argument has been repeatedly refuted. *See e.g., Herbst v. International Telephone & Telegraph Corp.,* 495 F.2d 1308, 1314–15 (2d Cir.1974); *Green,* 406 F.2d at 301; *Sanders,* 82 F.R.D. at 101; *Feder,* 52 F.R.D. at 183. In discussing the possibility of denying class certification due to the need for individual determination of certain issues, Judge Weinstein remarked that to " 'acknowledge defendants' position at this point would be, in effect, an emasculation of the vitality and pliability of the amended rule....' " *Dolgow,* 43 F.R.D. at 490 (*quoting Siegel v. Chicken Delight, Inc.,* 271 F.Supp. at 727).

As to the second requirement of 23(b)(3), a class action may well be superior in this case to any other alternative. "There can be little doubt that an action on behalf of a group of defrauded securities purchasers presents a particularly appropriate reason for a class action." *Dolgow,* 43 F.R.D. at 488. A good faith class action can "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated...." Advisory Committee Notes to Rule 23 (1966 Amendments, Subdivision (b)(3)). Evidence has been presented showing that the original issue was sold to over 968 purchasers, 20 of whom were institutional investors. The purchasers are geographically dispersed (Def. Letter of June 6, 1984). Although this figure is distributed among twenty-nine underwriters, the classes may well be numerous enough to satisfy the Rule 23 requirement of numerosity and impracticality of joinder. Class certification is an important mechanism for the small investor to have his day in court. *See Escott v. BarChris Construction Corp.,* 340 F.2d 731, 733 (2d Cir.1965), *cert. denied,* 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1966); *see also Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 560 (2d Cir.1968); *Feder,* 52 F.R.D. at 184; *Dolgow,* 43 F.R.D. at 484–45. Classes consisting of plaintiffs who bought from each individual underwriter will therefore be certified, *if* the interested purchasers who wish such certification are able to produce evidence of the numerosity and impracticality of joinder of members of their proposed class.

To date, no breakdown of how many investors bought from each underwriter has been presented, despite repeated urging by the court, and such information is essential to determine of whether the numerosity requirement has been met. Rule 23(a)(1) requires plaintiffs to make a positive showing that the class is too numerous for practical joinder. *Demarco v. Eden,* 390 F.2d at 845; *Lloyd v. Industrial Bio-Test Laboratories, Inc.,* 454 F.Supp. 807, 812 (S.D.N.Y.1978). As this information is within the control of defendants Oryx, Moore, Robertson, and Laidlaw, the court orders them to furnish plaintiffs with the appropriate records within 20 days. The court retains jurisdiction to order notice pursuant to Rule 23(c)(2). The plaintiffs' claims against underwriters other than their immediate sellers are dismissed and Oryx is granted summary judgment dismissing the claims against it for the reasons stated above. Fed.R.Civ.P. 56(c). The only claims remaining in this litigation are those under section 12 asserted by the Akermans and by Dr. Kuhn, against Laidlaw and Moore, respectively.

SO ORDERED.